In re The **MORRIS PLAN COMPANY OF IOWA**, Debtor.

**Bankruptcy No. 85–01852C.**

United States Bankruptcy Court, N.D. Iowa.

June 6, 1986.

Harry D. Dixon, Jr., of Dixon, Dixon & Minahan, Omaha, Neb. and Carl W. Schuettpelz, Cedar Rapids, Iowa, for debtor-defendant.

James W. Hall and Joe H. Harris, of Hall & Irvine, Cedar Rapids, Iowa, for plaintiffs.

Michael G. Helms, of Schmid, Ford, Mooney & Frederick, Omaha, Neb. and Minor Barnes, of Pickens, Barnes & Abernathy, Cedar Rapids, Iowa, for Peter Bezanson.

John W. Costello, of Arvey, Hodes, Costello & Burman, Chicago, Ill., Thomas J. Wilkinson, Jr., of Wilkinson & Van Horne, Cedar Rapids, Iowa, for Unsecured Creditors' Committee.

### MEMORANDUM re: ORDER
#### Overruling Motion to Dismiss

MICHAEL J. MELLOY, Bankruptcy Judge.

The Motion to Dismiss filed by Michael W. Unertl, Deborah J. Unertl, Marvin G. Sutton, Sr., and Norma J. Sutton, came on for hearing before the Court on the 18th day of April, 1986. The Court heard evidence presented at the hearing on the Motion to Dismiss, and requested that the parties submit briefs. Those briefs have now been filed and the Court herewith makes its Order on the Motion to Dismiss. The following shall constitute the Findings of Fact, Conclusions of Law and Order pursuant to F.R.B.P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

The Motion to Dismiss filed by these creditors sets forth two grounds for dismissal. First, the Movants argue that the Debtor, The Morris Plan Company of Iowa ("Morris Plan of Iowa"), is not eligible to file for reorganization pursuant to 11 U.S.C. § 109(b)(2). Alternatively, the Movants allege that the filing by Morris Plan of

Iowa was in "bad faith" and that therefore the case should be dismissed.

The evidence shows that Morris Plan of Iowa is a wholly owned subsidiary of The Morris Plan Company. The Morris Plan Company is a wholly owned subsidiary of MorAmerica Financial Corporation. MorAmerica Financial Corporation was formed in 1958 as a financial holding company which has as subsidiary corporations a number of different financial entities. These entities include The Morris Plan Company, which has as its subsidiaries The Morris Plan Company of Iowa (the Debtor herein), as well as The Illinois Morris Plan Company, The Morris Plan Company of Wisconsin, and MorAmerica Life Insurance Company. Other subsidiaries of MorAmerica Financial Corporation include a mortgage company, an insurance agency, a venture capital and investment company, and a subsidiary owning industrial thrifts in Nebraska and Iowa. As of the date of filing, MorAmerica had total liabilities of over $75,000,000, and several thousand creditors.

MorAmerica Financial Corporation is owned by the Peter Bezanson family. Mr. Bezanson, who founded the company in 1958, personally owns 98 percent of the stock, with the other two percent owned by his immediate family members. Mr. Bezanson is Chairman of the Board of both MorAmerica Financial Corporation and Morris Plan of Iowa.

Morris Plan of Iowa is an industrial loan corporation organized under Chapter 496A, Code of Iowa. The company was formed in 1916 and has operated as an Iowa industrial thrift continuously since that date. Mr. Bezanson became general manager of the company in 1951. Thereafter, he acquired all the stock. The company became a subsidiary of The Morris Plan Company as a result of the corporate reorganization when MorAmerica was formed. At the date of filing, Morris Plan of Iowa had nearly $90,000,000 in liabilities and over 15,000 creditors.

Industrial thrift companies, such as Morris Plan of Iowa, issue securities and thrift certificates to individuals and corporations who loan money to the thrift institution. These certificates include demand thrift certificates.

Demand thrift certificates allow the customer to redeem all or part of the certificate upon demand. The President of Morris Plan of Iowa, John Wolfe, testified that the certificates gave the company the right to withhold payment for up to 60 days from the date redemption was demanded. However, Morris Plan of Iowa had never exercised that right prior to filing its Chapter 11 Petition.

Industrial thrifts are prohibited by statute and regulation from accepting deposits. This prohibition precludes Morris Plan of Iowa from issuing demand accounts, similar to checking accounts. In fact, Morris Plan of Iowa had attempted to establish NOW accounts (Negotiable Order of Withdrawal accounts), which are a form of demand account, in the 1982–1983 time period. Due to the statutory prohibition against the acceptance of deposits, the Auditor's office required Morris Plan to discontinue that type of activity.

The money received by Morris Plan of Iowa in return for issuance of thrift certificates is then loaned to individuals and businesses. These loans are principally consumer-type loans for automobiles, real estate, and household goods. The company also engages in a certain amount of small commercial loan activity.

In addition, Morris Plan of Iowa over the years has loaned money to other affiliates of MorAmerica. These loans would be made by loaning money to its parent corporation, The Morris Plan Company. The Morris Plan Company would in turn loan money either to the parent organization, MorAmerica, or down to the other subsidiaries of The Morris Plan Company, those subsidiaries being The Illinois Morris Plan Company, The Morris Plan of Wisconsin, Inc., and MorAmerica Life Insurance Company. In recent years these loans from Morris Plan of Iowa to The Morris Plan Company and other affiliate corporations ranged from a high of $56,212,378 as of the

end of the fiscal year ending September 30, 1981, to a low of $35,503,144 as of the end of the fiscal year ending September 30, 1984. As of September 30, 1985, those loans had increased to $49,955,823. The testimony shows that of the approximately $50,000,000 in loans made by Morris Plan of Iowa to The Morris Plan Company, $15,000,000 had been loaned by The Morris Plan Company to its subsidiary companies, while the remaining $35,000,000 had been loaned to the parent corporation, MorAmerica.

The record is unclear as to the entire explanation for the increase of indebtedness from approximately $35,000,000 in 1984 to $50,000,000 in 1985. However, some of the increase was attributable to the fact that MorAmerica had also issued investments to the general public and used the proceeds from those investments to fund its various operations. As of October 1, 1984, MorAmerica discontinued issuance of those debt securities and redeemed the outstanding securities as they became due. The security holders were advised that they could invest the monies received through the redemption of those certificates in the debt securities issued by Morris Plan of Iowa. Consequently, Morris Plan of Iowa was required to loan more money to MorAmerica (through The Morris Plan Company) in order for MorAmerica to have the necessary liquidity to redeem the debt securities as they became due.

At the same time, MorAmerica was experiencing financial difficulty with its mortgage company subsidiary. An undetermined amount of money was loaned by MorAmerica to that subsidiary in the year prior to the Chapter 11 filing.

In February, 1985, state regulators were becoming uncomfortable with the Morris Plan of Iowa and MorAmerica financial situation. The audit report for the fiscal year ending September 30, 1984 had not been received as of that date, and the State Auditor was aware of the fact that MorAmerica and Morris Plan of Iowa had changed auditors and were having difficulty in preparing the report. In April, 1985, the State

Auditor demanded and began to receive monthly financial reports on the status of both companies. Subsequently, it became clear that MorAmerica would have difficulty meeting its loan obligations to the subsidiary corporations. As a consequence, the filing of a Chapter 11 proceeding for MorAmerica became a possibility.

These events culminated in a meeting held on August 30, 1985. In attendance at that meeting were representatives of the State Auditor's office, including the Auditor and Mr. William Hawthorne, Director of the Financial Institutions Division of the Auditor's office, as well as representatives of Morris Plan of Iowa and MorAmerica. The alternatives available to both companies were discussed in great detail. The parties were concerned that the two companies were so intertwined in the minds of the general public that a filing by MorAmerica would result in a run on the assets of Morris Plan of Iowa.

Liquidation of Morris Plan of Iowa was considered as an alternative, but was rejected because the Auditor's office retained confidence in the management abilities of The Morris Plan of Iowa management, and due to the Auditor's belief that reorganization would provide the best alternative for maximizing recovery to the creditors and treating all creditors fairly.

The Auditor's office was also very concerned about the protracted time period which would be required if the Auditor were to close Morris Plan of Iowa and commence liquidation. The Auditor's office had recent experience with the reorganization of an industrial thrift known as American Securities. The Auditor's office felt that bankruptcy court reorganization had been a very workable solution to those problems and was very hopeful that the same type of solution could be worked out for Morris Plan of Iowa.

Thus, the conclusion reached at the meeting, which was supported and endorsed by the Auditor's office, was to have both companies, that is, MorAmerica and Morris Plan of Iowa, file for Chapter 11 reorganization. It was the opinion of the Auditor's

office that such a filing would be the best way to protect all creditors, prevent a run on Morris Plan of Iowa assets and allow Morris Plan to treat all creditors fairly and equally. MorAmerica and Morris Plan of Iowa filed their Chapter 11 petitions that same day.

## DISCUSSION

Turning first to the "bad faith" allegation, the Court concludes that based upon the evidence and the testimony, there is no basis for a finding of "bad faith". The Motion to Dismiss is thus overruled as to that ground set forth in the Motion.

■■■ This Court concurs with the numerous bankruptcy courts which read into Chapter 11 an implied good faith requirement. *See, e.g., Matter of Winn,* 43 B.R. 25, 28 (Bkrtcy.M.D.Fla.1984). A survey of cases applying and interpreting the good faith requirement establishes a pattern of common elements: The debtor must have real assets, real debts, and real creditors; the purpose of filing must be valid in light of the Congressional intent of Chapter 11 relief and cannot be an abuse of the jurisdiction of the bankruptcy court. *In re Cardi Ventures, Inc.,* 59 B.R. 18, 22 (Bkrtcy.S.D.N.Y.1985); *In re Harvey Probber, Inc.,* 44 B.R. 647, 649 (Bkrtcy.D.Mass. 1984).

The case cited by the moving parties in support of their motion follows the above-described approach but does not lend any support to the claim of a "bad faith" filing. In *Matter of 299 Jack-Hemp Associates, A Partnership,* 20 B.R. 412 (Bkrtcy.S.D.N.Y. 1982), the debtor was a partnership which had been formed only one day prior to the filing of the bankruptcy proceeding. The partnership was formed with a clear intent to abuse the bankruptcy laws. Because of its creation for the sole purpose of filing a Chapter 11 petition one day prior to filing, it was not in fact a legitimate entity.

■■■ The moving creditors' argument appears to center primarily on the "imprudent" lending practices of Morris Plan of Iowa. The argument seems to be stated

that since Morris Plan of Iowa engaged in imprudent lending practices, it should be barred from seeking Chapter 11 relief. Even if this Court were to assume the evidence showed imprudent lending practices, a finding this Court is not prepared to make one way or the other, such a finding would not support an allegation of bad faith. If every debtor who made a bad management decision or engaged in imprudent lending or business practices was barred from bankruptcy relief, this Court could dispose of the large majority of its caseload by issuing wholesale dismissals.

■■■ The petitioning creditors' brief states: "... the depositors are entitled to make a run on the Morris Plan Company of Iowa. If the result be insolvency, so be it." Plaintiffs' Brief in Support of Their Motion to Dismiss, p. 20. However, this Court does not recognize any statutory, constitutional or common law right for any individual or group to make a "run" on any financial institution. The very essence of the bankruptcy procedure is to afford to all creditors a fair, orderly and equitable distribution of any assets which may be available to pay the creditors' claims. This Court is not prepared to sanction a procedure whereby those who are quickest or live closest to a Morris Plan office will be the ones paid, while those who delay will receive nothing.

■■■ Morris Plan of Iowa is a long-established company with real debts and real creditors. Clearly, the decision to file for Chapter 11 reorganization was made in the belief that reorganization would be the best way to maximize recovery for creditors and to provide for an orderly and equitable distribution of the assets available for payment to the creditors of Morris Plan of Iowa. Not only was this decision thought best by the Morris Plan Company of Iowa management but the decision was concurred in and endorsed by the regulatory authority, the Iowa State Auditor.

For all of the foregoing reasons, this Court concludes that the Motion to Dismiss based upon a "bad faith" filing should be overruled.

The more troublesome issue is the fundamental question of whether Morris Plan of Iowa is disqualified from filing a Chapter 11 proceeding pursuant to 11 U.S.C. § 109(b)(2). 11 U.S.C. § 109(b)(2) provides, in relevant part:

(b) A person may be a debtor under chapter 7 of this title only if such person is not— ...

(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, or industrial bank or similar institution which is an insured bank as defined in Section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h)); ...

Additionally, 11 U.S.C. § 109(d) provides:

(d) Only a person that may be a debtor under chapter 7 of this title, except a stockbroker or a commodity broker, and a railroad may be a debtor under chapter 11 of this title.

Two tests have developed to determine whether a particular entity falls within one of the excluded categories of Section 109(b)(2). The first test is described as a "state classification test." The second is a determination as to whether the debtor is eligible under an "independent classification test."

The state classification test is the test adopted by the Eighth Circuit. *Gamble v. Daniel*, 39 F.2d 447 (8th Cir.1930), *appeal dismissed*, 281 U.S. 705, 50 S.Ct. 464, 74 L.Ed. 1129 (1930), *cert. den.*, 282 U.S. 848, 51 S.Ct. 27, 75 L.Ed. 752 (1930); *First American Bank & Trust Co. v. George*, 540 F.2d 343 (8th Cir.1976), *cert. den.*, 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976); *see, also, In re Cash Currency Exchange, Inc.*, 762 F.2d 542 (7th Cir.1985); 2 Collier on Bankruptcy, § 109.02, at 109–14 (15th Ed.1985).

The Eighth Circuit stated in *First American Bank & Trust Co. v. George* as follows:

For further guidance, the courts have traditionally made reference to the applicable state laws to determine (1) how the entity is classified under state law, (2) what powers are granted to the entity, and (3) what activities actually engaged in were within the range of lawfully conferred powers.

540 F.2d at 346 (citations omitted).

Applying these state classifications tests, the Court must determine if state law classifies the entity as an excluded entity upon examination of the relevant state statutes. *Sims v. Fidelity Assur. Ass'n*, 129 F.2d 442 (4th Cir.1942), *aff'd*. 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943).

Under Iowa law, state banks are chartered and operated pursuant to Chapter 524 of the Code of Iowa. Section 524.107 specifically provides that no person doing business in the state of Iowa may use the words "bank" or "trust" or any derivative, or compound those words in any manner which would tend to create the impression that the entity is authorized to engage in the business of banking, except a state banking institution chartered and supervised pursuant to Chapter 524, Code of Iowa. Section 524.1603, Code of Iowa, makes it a criminal offense for anyone to engage in the business of receiving money for deposit or to transact business done by banks in violation of Section 524.107. Thus, Iowa has a strong statutory prohibition against any entity operating as a bank or being considered a bank except those entities incorporated and chartered under Chapter 524 of the Code of Iowa.

Chapter 524 confers numerous powers upon those entities chartered as banks under that Chapter. These powers include the receipt of money upon deposit in demand accounts or savings accounts; the repayment of deposits upon check, draft or order; the making of loans, including real estate loans; and the operating of a trust department. *See* Sections 524.103(5), 524.805(1), 524.902, 524.1001, Code of Iowa (1985). Chapter 524 also provides that banks incorporated under that Chapter have the power to secure deposit insurance pursuant to the Federal Deposit Insurance Act (FDIC) and have the power to become

a member of the Federal Reserve system. *See* § 524.802(2) and (3).

On the other hand, industrial loan corporations are business corporations organized pursuant to the Iowa Business Corporation Act, Chapter 496A, Code of Iowa (1985). They are regulated pursuant to Chapter 536A of the Iowa Code. Unlike banks, savings and loan associations, and building and loan associations, industrial loan corporations have no authority to receive deposits and, in fact, are specifically prohibited from receiving deposits. *See*, § 524.107, Code of Iowa (1985). As stated above, all entities except those created pursuant to Chapter 524 are expressly prohibited from creating any impression that they are a bank. This prohibition would extend to industrial loan companies incorporated pursuant to Chapter 536A of the Iowa Code.

There are other differences between an industrial loan company and a bank under Iowa law. Industrial loan corporations are authorized by statute to issue debt instruments to the general public in the form of thrift certificates, installment thrift certificates, certificates of indebtedness, promissory notes or similar evidences of indebtedness. *See* Section 536A.22, Code of Iowa (1985). Unlike banks, Iowa industrial loan corporations are exempt from registering such securities pursuant to Chapter 502, Code of Iowa (Iowa Uniform Securities Act—Blue Sky Law). *See*, Section 502.-202(16).

■ Under the state classification test, the fact that an entity may possess powers and perform functions similar to the functions of a bank is not dispositive on the issue of eligibility for filing under Chapter 11. *See, Gamble v. Daniel, supra,* and *In re Cash Currency Exchange, Inc., supra.* In both of those cases the entities in question exercised some of the traditional powers of a bank. In the *Gamble v. Daniel* case, the entity was a trust company that performed most, if not all, of the trust functions normally performed by a bank. The Eighth Circuit Court in that case ruled that since the entity was not permitted to receive deposits, it lacked one of the essential characteristics of a bank and therefore was not excluded from filing under the Bankruptcy Act. In the *Cash Currency Exchange, Inc.* case, the Seventh Circuit Court held that the entity again performed several of the traditional bank services, including cashing of checks, drafts, the issuance of money orders, and offered several other services a bank may also offer. Yet, the Court held that the debtor did not possess the essential element of a bank: that is, the right to accept deposits. Accordingly, the Court ruled that the Currency Exchange was an eligible debtor under the Bankruptcy Code.

Even though it is clear there is no statutory basis to find Morris Plan of Iowa to be a bank and thus ineligible for relief under 11 U.S.C. § 109(b)(2), the Eighth Circuit stated in *First American Bank & Trust Co. v. George,* that "The utilization of the incorporating state's classification of the corporation does not mean that state law will be followed literally without regard to an assessment of the actual operation of the petitioning corporation." 540 F.2d at 346.

In making this assessment, the Court stated that entities excluded under Section 4 of the Bankruptcy Act (predecessor to Section 109(b)(2)) have three things in common:

(1) they are extensively regulated by well-organized departments of the states and of the United States; (2) they are subject to express statutory procedures for liquidation; and (3) the nature of their business is public or quasi-public and involves interests other than those of creditors. (citations omitted).

540 F.2d 343, 349.

Applying these factors to the Morris Plan of Iowa situation, it would appear that the third factor is clearly met. Morris Plan of Iowa had over $85,000,000 in thrift certificates outstanding as of the date of filing, with over 15,000 creditors. In the sense that Morris Plan solicits customers from the general public, as do banks, Morris Plan of Iowa clearly shares a common

characteristic with banks in that the nature of the business is public or quasi-public.

It is in the other two criteria that there is a substantial difference between an industrial thrift corporation such as Morris Plan of Iowa, and a bank. In *First American Bank & Trust Co., supra,* the Court found that First American Bank & Trust Co. was subject to the extensive regulatory authority of the state banking board. 540 F.2d at 347. The Court went on to state that North Dakota specifically provided for liquidation of that type of business under the North Dakota code. The same supervisory and administrative safeguards afforded for the liquidation of banks were provided to entities such as First American Bank & Trust Co. *Id.*

Under Iowa law, banks are regulated by the Iowa Department of Banking. In addition, banks would be under the general supervisory control of the Federal Deposit Insurance Corporation and the Federal Reserve System if the bank elects membership in the Federal Reserve. The Iowa statute contains extensive provisions for the liquidation of banks. *See,* Sections 524.1301–1304, Code of Iowa (1985). These provisions also allow for the appointment as receiver the F.D.I.C., which has its own extensive regulatory scheme for bank liquidations. On the other hand, there is little statutory provision for the liquidation of industrial loan corporations. Essentially, the Iowa Code provides that the state auditor can apply for a state court receiver. *See,* Sections 536A.19, 536B.16, Code of Iowa (1985).

It is the belief of this Court that this difference in regulatory and liquidation procedure is the crucial element in the determination of the Debtor's eligibility for filing under the Bankruptcy Code. The drafters of the Bankruptcy Code recognized that those entities which were excluded from eligibility were entities which had a comprehensive scheme of liquidation provided for by other statutes or regulations. 2 *Collier on Bankruptcy,* § 109.02, at 109–15 (15th Ed.1985). *See, also,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977);

S.Rep. No. 989, 95th Cong., 2d Sess. 31 (1978); 1978 U.S.Code Cong. & Admin. News, p. 5787. It appears to be the clear intent of Congress that those entities that do not enjoy such a scheme of liquidation should be able to avail themselves of the liquidation and reorganization provisions of the Bankruptcy Code.

While the Bankruptcy Code and reorganization process lacks perfection and may appear tortuous in its slowness at times, it still remains a system which is specifically designed to provide for the orderly liquidation of businesses and to give those businesses that have an ability to reorganize a statutory scheme for reorganization. On the other hand, state court receivership lacks the clear statutory guidelines which govern the bankruptcy proceedings. Mr. William Hawthorne, Director of Financial Institutions for the Iowa State Auditor, attested to that fact in his testimony before the Court. He stated that the liquidation process which would have to be undertaken by the Auditor's office would be an extremely slow procedure, and would in all probability tie up the depositors' monies for a much longer period of time than the Bankruptcy Court reorganization. Based upon his experience with both state court receiverships and another industrial loan company which had gone through reorganization, it was his opinion that the reorganization process under the Bankruptcy Code was quicker and much more preferable to the depositors.

The Movants make much of the argument that the demand thrift certificates issued by Morris Plan of Iowa are very similar to a passbook savings account. Thus, their argument is that the thrift certificates are in essence a deposit and that therefore Morris Plan of Iowa should be treated as a bank. They cite several cases, including *In re Cash Currency Exchange, Inc., supra,* and *First American Bank & Trust Co. v. George, supra,* for the proposition that the essential characteristic of a bank is the ability to accept deposits.

The Court concedes that this argument is certainly the most troublesome aspect of

this case. The demand thrift certificates are similar in many respects to a passbook savings account. Yet, the distinction between accounts and thrift certificates is a distinction made by Iowa law. Under Iowa law, these certificates would be subject to registration under the Iowa Uniform Securities Act, Chapter 502, were it not for a specific statutory exception for thrift certificates issued by industrial loan companies under § 502.202(16). The Iowa statute is unequivocal in its classification of the thrift certificates issued by industrial loan companies as securities, while classifying the accounts maintained by the banks as deposits. It is the duty of this Court to give effect to the clear wording of the statute. *Hinders v. City of Ames*, 329 N.W.2d 654, 655 (Iowa 1983).

The Court cannot ignore the clear statutory prohibition set forth in the Iowa Code against any entity other than a bank accepting deposits. There has been no evidence presented to support a finding that Morris Plan of Iowa exercised ultra vires powers and illegally accepted deposits. Even if that were the case, the Eighth Circuit has rejected classification of companies for purposes of determining eligibility for relief under the Bankruptcy Code by the alleged exercise of ultra vires powers. *Gamble v. Daniel, supra.* Thus, this Court finds that the Debtor, Morris Plan of Iowa, is prohibited by statute from accepting deposits, and in fact, did not accept deposits as the term "deposits" is commonly used.

This Court concludes that the essential element lacking to determine that Morris Plan of Iowa is an excluded entity is the lack of a comprehensive scheme of regulation and liquidation. As the distinction between financial institutions becomes increasingly blurred, this Court believes that the test for eligibility will become increasingly the test of whether there is a comprehensive scheme of liquidation outside the Bankruptcy Court. As banks set up insurance agencies, discount brokerage services, and lobby for the right to underwrite securities, while brokerage houses set up cash management accounts with services rang-

ing from traveler's checks and credit cards to check writing privileges, it is going to become increasingly difficult to classify institutions on the basis of whether those institutions accept "deposits" as that term has been historically used. However, this Court believes that the essential holding of *First American Bank & Trust Company v. George, supra,* is that there must be a comprehensive scheme of liquidation outside of the Bankruptcy Court to render an entity ineligible for Bankruptcy protection pursuant to 11 U.S.C. § 109(b)(2).

■ Based on the foregoing, this Court concludes that under the state classification test, Morris Plan of Iowa is not ineligible to file under Title 11, pursuant to 11 U.S.C. § 109(b)(2).

■ Turning to the independent classification test, this Court adopts the reasoning set forth in *In re Cash Currency Exchange, Inc., supra.* In that case, the Seventh Circuit held that the general rule of statutory construction was that the enumeration of specific exemptions set forth in 11 U.S.C. § 109(b) applies only to the entities specifically stated. The Court therein stated:

> If Congress had intended to make the list of excluded entities illustrative rather than exhaustive, it could have used the rule of statutory construction found in the Bankruptcy Code which provides that the words " 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3). Because Congress chose not to do so, we conclude that the list of excluded entities is intended to be exhaustive.

762 F.2d at 552.

■ Since this Court has concluded that Morris Plan of Iowa does not meet the definition of a bank or any of the other institutions listed in § 109(b)(2), that rule of statutory construction leads to the conclusion that Morris Plan of Iowa is not an excluded entity. Likewise, the Morris Plan of Iowa would not be considered a "... similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C.

§ 1813(h))". Only those institutions which have incorporated under the Iowa Banking Statute, Chapter 524 Code of Iowa, are eligible for FDIC insurance. Since Morris Plan of Iowa has not incorporated under that statute, Morris Plan of Iowa is not eligible for FDIC insurance and would not meet the definition of a similar institution.

## ORDER

For all the reasons stated above, the Court concludes the Morris Plan Company of Iowa is an entity eligible to file for relief under Title 11, United States Code, and that the filing of the Morris Plan Company of Iowa was not in bad faith. Accordingly, the Motion to Dismiss filed by Michael W. Unertl and Deborah J. Unertl, Marvin G. Sutton, Sr., and Norma J. Sutton, is overruled in its entirety.