In re AFFILIATED FOOD STORES,
INC. GROUP BENEFIT TRUST,
Debtor.

Bankruptcy No. 391–31265 RCM–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Dec. 8, 1991.

Judith A. Swift, James M. Kloncnik, Dallas, Tex., for debtor.

Bradley H. Rice, Fort Worth, Tex., for Diamond.

## AMENDED MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

On September 6, 1991, the Court considered the motion of Diamond Food Markets, Inc. ("Diamond"), a creditor, to dismiss the above-captioned bankruptcy case for lack of subject matter jurisdiction. Specifically, Diamond asserts that Affiliated Food Stores, Inc. Group Benefit Trust ("Debtor") is not a "person" eligible for relief under § 109(a) and (d) of the Bankruptcy Code. Diamond further asserts that Debtor, acting as a self-funded employee benefit plan, does not conduct its business for profit, and therefore, does not qualify as a business trust under § 101(8)(A)(v) of the Bankruptcy Code. Alternatively, Diamond continues, even if the Debtor is a "person" for purposes of § 109, it is, in fact, a domestic insurance company, and therefore, specifically excluded from seeking relief. Debtor contends it is eligible for bankruptcy relief as a business trust, and that it is not specifically excluded from filing under any of the listed exceptions set forth in § 109(b) of the Code.

The Court finds initially that this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and 1334, and 11 U.S.C. § 109(a) and (d), and Bankruptcy Rules 1017 and 9014. The Court, having considered the testimony, the arguments of counsel, and reviewed the relevant pleadings and the law, overrules the motion to dismiss, and renders the following findings of fact and conclusions of law. The findings stated herein, although in narrative form, are made pursuant to Bankruptcy Rule 7052.*

* NOTE: The prior Memorandum Opinion entered October 3, 1991 is withdrawn, and the Amended Memorandum Opinion, which does not change the prior ruling herein, is substituted in its place.

1. Affiliated, a debtor in a related proceeding, is a retailer-owned cooperative. Affiliated was

### Factual Background

Affiliated Food Stores, Inc. Group Benefit Trust (the "Trust") was established by Affiliated Food Stores, Inc. ("Affiliated") in 1967 for the purpose of providing low-cost group medical benefits to members of its cooperative group, on a voluntary basis.[1]

Pursuant to the terms of the 1981 Amended Declaration of Trust, the Trustees of the Trust were authorized to establish a self-funded employee benefit plan. Affiliated's member employers contributed to the Trust on behalf of their employees on a regular basis, and these funds were the sole asset of the Trust. The funds collected were used to pay health claims, and to cover the Trust's administrative expenses. There was no evidence the Trust had purchased reinsurance or excess stop loss coverage with any insurance carrier.

The Trustees administered the Trust through a third party plan administrator who was responsible for determining benefits, handling claims, and paying benefits. An employee who had a claim would file it with the plan administrator. The Trust's liability for claims was specifically limited to the funds it held from member assessments. It had no obligations to pay further claims or expenses beyond the funds collected.

Because the Trust was seriously underfunded, on February 15, 1991, it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor has several hundred creditors, including health care providers and employees, holding scheduled claims in excess of $1.35 million. More than 400 entities have filed proofs of claim against Debtor.

### Discussion

■ Eligibility for relief under the Bankruptcy Code is limited to those entities or individuals identified as "person[s]" under the Code. § 109(a) and (d). Section

formed as a cooperative in 1946 by a group of grocers in Dallas, Texas. Affiliated is engaged primarily in the wholesale grocery distribution business. As of April, 1990, it supplied groceries to approximately 415 retail grocer-members.

101(35) defines "person" as including a corporation. A "corporation", as defined by the Code, includes a business trust. § 101(8)(A)(v).

The Bankruptcy Code includes no definition of the term "business trust". However, since a business trust is defined as a type of corporation, many Bankruptcy Courts have assumed that the entity must have the attributes of a corporation. In *In re Ralph Faber Trust*, 113 B.R. 599 (Bankr.D.N.D.1990), the Bankruptcy Court, in reviewing the history of § 109(a), recently stated:

> The inclusion of a business trust in the definition of a 'corporation' and the distinction between business trusts and nonbusiness trusts is not new. Section 1(8) of the former Bankruptcy Act provided that the term 'corporation' include any business conducted by trustees providing the beneficial or ownership interest is evidenced by a certificate or other written instrument. 11 U.S.C. § 1(8). In *Associated Cemetery Management, Inc. v. Barnes*, 268 F.2d 97, 103 (8th Cir. 1959), the circuit believed that the only trusts included by section 1(8) in the definition of 'corporation' were those which were associations of beneficiaries formed for the purpose of conducting business. The sense was that organizations, whether incorporated or not, are regarded as within the scope of a corporation for bankruptcy purposes if they are associations of persons joined together for a common business or commercial purpose and which have conducted their affairs in a fashion reminiscent of a corporation. *Pope & Cottle Co. v. Fairbanks Realty Trust*, 124 F.2d 132, 134 (1st Cir.1941).

*In re Ralph Faber Trust, supra* at 600–601.

Some courts have taken a more restrictive approach, and have incorporated the test set out in *Morrissey v. Comm'r*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935), which establishes the characteristics of a business trust for federal income tax purposes. Those characteristics include: (i) business functions; (ii) transferrable certificates of beneficial interests; (iii) central-ized management; (iv) continuity of life; and (v) limited liability. *In re Betty Hays Trust*, 65 B.R. 665 (Bankr.D.Neb.1986); *In re L & V Realty Trust*, 61 B.R. 423 (Bankr.D.Mass.1986); *In the Matter of Cohen*, 4 B.R. 201 (Bankr.S.D.Fla.1980); *In re Armstead and Margaret Wayson Trust*, 29 B.R. 58 (Bankr.D.Md.1982); *In re St. Augustine Trust*, 109 B.R. 494 (Bankr.M.D.Fla.1990).

Other courts have simplified the traditional test, and looked primarily to the trust's operations to determine whether they include substantial business activities for the benefit of investors. They cite statutory changes in the Code's definition of the term "corporation" as evidence of Congress' intent to broaden the types of trusts that can qualify for bankruptcy relief. Under the Act, only those trusts "conducted by a trustee or trustees wherein beneficial interest or ownership [was] evidenced by certificates or other written instruments", qualified to be debtors. 11 U.S.C. § 1(8). The Code's deletion of the Act's documentary requirement removed a technical restriction on bankruptcy eligibility. *Collier on Bankruptcy* (15th ed. 1990), ¶ 101.08; *In re Medallion Realty Trust*, 103 B.R. 8 (Bankr.D.Mass.1989) *aff'd* 120 B.R. 245 (D.Mass.1990); *In re Treasure Island Land Trust*, 2 B.R. 332 (Bankr.M.D.Fla. 1980); *In re Tru Block Concrete Products, Inc.*, 27 B.R. 486 (Bankr.S.D.Cal.1983); *Matter of Captran Creditors Trust*, 53 B.R. 741 (Bankr.M.D.Fla.1985); *In re Universal Clearing House Co.*, 60 B.R. 985 (Bankr.D.Utah 1986).

*Medallion, Tru Block,* and *Captran* represent a significant departure from the traditional tests for business trusts, in that they modify the requirement that the trust engage in commercial activity for profit. Under *Medallion's* test, the trust need only confer a benefit on the trust's beneficial owners. In each of the above instances, the courts have recognized that a benefit was conferred upon investors where the aim or goal of the trustee's business activity was financial or pecuniary gain. The actual form of the benefit conferred on investors or beneficial owners may vary widely. Efforts made to realize a maxi-

mum return for creditors and stockholders through the liquidation of assets has been recognized to constitute sufficient business activity to support a finding that a business trust existed. The fact that the trust failed to earn profits has not been found determinative on this point. *In re Tru Block Concrete Products, Inc., supra* (trust created to liquidate predecessor corporation eligible to file bankruptcy as "business trust", despite fact liquidation of a corporation does not meet business activity test required of a business trust for federal income tax purposes); *Matter of Captran Creditors Trust, supra* (Same); *contra, In re Hemex Liquidation Trust,* 129 B.R. 91 (Bankr.W.D.La.1991). In *In re Universal Clearing House Co., supra,* the court focused on the type of activity for which the trust was designed, and the powers given the trustee under the trust instrument, disregarding the fact that the trust never earned a profit.

Debtor's business activity meets the requirements of a business trust for purposes of determining eligibility to seek relief under the Bankruptcy Code. Under the terms of the Amended Declaration of Trust, the Trust's stated purpose was to provide and maintain health benefits for employees of the member stores, and families of those employees. Its business activity entailed collecting and receiving employer contributions from member stores (Art. III and V, § 14), and paying claims made by employees of member stores and their families (Art. II, § 20).

The type of business activity described in the trust instrument contrasts sharply with that of donative trusts, entities traditionally excluded by the Bankruptcy Act and Code from the category of business trusts. Here Debtor's principal purpose is not effectuating a settlor's estate plan through the preservation of a trust *res.* The purpose of its business activity is designed to lower costs of health care coverage for member stores. Debtor does not merely hold title to funds and attempt to preserve them for the benefit of member stores' employees. Through pooling the assessments paid by the member stores, it provides health care coverage for the member stores' employees at a financial discount. A discount effect is achieved by consolidating the processing and payment of the stores' health care claims, thereby reducing the self-insurer's overall administrative costs. Debtor analogizes its business activity to that of a large volume purchaser of medical services, such as an HMO, which, through arrangements reached with health care providers, is able to control costs for its enrollees. *In re Family Health Services, Inc.,* 101 B.R. 618 (Bankr.C.D.Cal.1989); *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 339, n. 7, 102 S.Ct. 2466, 2470, n. 7, 73 L.Ed.2d 48 (1982). The lowered health costs represent a tangible financial benefit realized by both the member stores and the Trust beneficiaries, whose claims are paid through this system. *In re Michigan Real Estate Insurance Trust,* 87 B.R. 447 (E.D.Mich.1988) (an unincorporated entity formed for the purpose of reducing the cost of health care for its members, and, which operated as a business trust, was eligible for Chapter 11 relief).[2]

**2.** Additionally, the Trust possesses many of the specific features of a corporation. *Morrissey v. Comm'r, supra.* The Trust imposes no restriction on the transferability of the beneficiaries' interests. Also, under the terms of the Amended Declaration of Trust, management of the Trust's operations is centralized in the Trustee, and, like a corporation, liability of the Trust is limited to the assets it has on hand, funds collected from assessments made against the member stores.

No familial relationship exists between the beneficiaries of the Trust and its settlors. Moreover, the funding of the Trust distinguishes it from a family trust. Unlike beneficiaries of a family trust, "recipients of a settlor's largesse", here the beneficiaries' interests in the Trust arise from the voluntary pooling of capital contributed by the independent member stores to cover anticipated health care claims. *In re Medallion Realty Trust, supra* at 11. These features distinguish it from estate-planning devices which have consistently been excluded from the category of business trusts. *Cf., In the Matter of Cohen, supra* (Land trust failed to qualify as a business trust where trust business activity, a close family enterprise, involved conservation of a single parcel of real property; trustee had few powers without written consent of beneficiaries; and beneficial interest not freely transferrable); *In re Armstead & Margaret Wayson Trust, supra* (Testamentary trust failed to quali-

■ Having established that Debtor meets the requirements of a business trust, the Court directs itself to Diamond's alternate argument, that the Trust is a domestic insurance company under applicable Texas law, and is therefore specifically excluded from those entities that may seek relief under Title 11. § 109(b)(2).[3] Diamond argues that, because the Texas Insurance Code provides a regulatory scheme and statutory mechanism for liquidating entities like the Trust, and because it is functionally similar to an insurance company, the Trust should not be eligible for bankruptcy relief.

The Trust takes issue with Diamond's characterization of it as an insurance company. Though the parties' interpretation of the Trust diverge in all other respects, both agree that the Trust may be legally characterized as a self-funded multiple employer welfare arrangement ("MEWA") under ERISA, and is properly classified as an employee welfare benefit plan. 29 U.S.C.A. § 1002(1) (West 1985).[4] In fact, the Department of Labor has ruled, under circumstances similar to those involved in the case at hand, that a trust maintained by a cooperative made up of independent grocery stores, which offered welfare benefits, constituted a MEWA. [Plans and Clauses] Pension Plan Guide (CCH) ¶ 23,800Q (June 1, 1990).

In determining whether an entity is excluded from being a debtor under § 109(b)(2) of the Code, courts have employed two tests: (1) the state classification test; and (2) the independent classification test. *Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542 (7th Cir.1985), *cert. denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985); *In re Morris Plan Co. of Iowa,* 62 B.R. 348 (Bankr.N.D.Iowa 1986); *In re Cent. Mortg. & Trust, Inc.,* 50 B.R. 1010 (S.D.Tex.1985); *In re Family Health Services, Inc., supra.*

The Seventh Circuit, in *Matter of Cash Currency Exchange, Inc., supra,* outlined the factors considered in the state classification test:

The state classification test involves examination of the entity's status under the law of the state of incorporation. If state law classifies the entity as one that is specifically excluded from being a debtor under section 109(b)(2), the inquiry generally ends there. If state law does not so classify the entity, the question becomes whether the entity is the substantial equivalent of those in the excluded class. The starting point in this analysis is a comparison of the powers conferred upon or withheld from the entity with the powers conferred upon or withheld from entities excluded under section 109(b)(2). The court also will examine the relevant statute to determine

---

fy as business trust where trust instrument, by its terms, prohibited disposition of beneficial interests); *In re St. Augustine Trust, supra* (Family trust ineligible for relief under Chapter 11, despite fact it engaged in business activity, where trust instrument showed trust was intended for personal needs and use of settlor's family; trustee played no significant role in trust management and operation; and beneficial interest not transferrable).

**3.** Section 109 of the Bankruptcy Code provides that certain entities may *not* be debtors. It states in pertinent part:

(b) A person may be a debtor under Chapter 7 of this title only if such person is not—
     *    *    *    *    *    *

(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union or industrial bank or similar institution which is an insured bank as defined in section 3(h) of

the Federal Deposit Insurance Act (12 USC 1813(h))....

**4.** ERISA defines a MEWA as an employee welfare benefit plan, or any other arrangement, which is established for the purpose of providing benefits to the employees of two or more employers, and was not a plan established or maintained (i) pursuant to a collective bargaining agreement, or (ii) by a rural electric cooperative. 29 U.S.C.A. § 1002(40)(A). ERISA defines an employee welfare plan as:

... any plan, fund, or program ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment....

29 U.S.C.A. § 1002(1) (West 1985).

whether the entity, like those in the excluded class, is subject to extensive state regulation; is subject to express statutory procedures for liquidation or rehabilitation; and conducts business of a public or quasi-public nature. *See First American Bank & Trust Co. v. George,* 540 F.2d 343, 349 (8th Cir.), *cert. denied,* 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976).

*Matter of Cash Currency Exchange, Inc., supra,* at 548.

As a starting point in its analysis, the Court must determine whether state law classifies MEWAs as insurance companies upon examination of the relevant state statutes. Under Texas law, the Insurance Code's definition of an insurance company is limited to companies licensed by the state which hold a certificate of authority. Tex.Ins.Code Ann., arts. 3.01 § 5, 3.57, 21.-01, and 21.07 (Vernon 1981). Article 1.14-1 of the Insurance Code imposes stringent civil penalties for acting as an unauthorized insurer. Those penalties consist of injunctive relief, and/or assessment of a penalty of not more than $10,000 for each day and for each act or violation. Tex.Ins.Code Ann. art 1.14-1, § 3 (Vernon 1991). Aside from the administrative and injunctive proceedings which may be initiated, private rights of action exist under the Deceptive Trade Practices Act to enforce violations of the Insurance Code. Tex.Ins.Code Ann., art. 21.21 § 16 (Vernon 1991).

The Trust fails to meet the criterion established under the Texas Insurance Code for insurance companies. It is neither licensed nor does it hold a certificate of authority. Most importantly, because of its status as a self-funded employee welfare benefit plan, it is currently not subject to regulation under Texas insurance laws.[5]

States were granted authority to supervise MEWAs as part of the 1982 amendments to ERISA. 29 U.S.C.A. § 1144(b)(6)(A). At that time, out of concern over the lack of effective regulation for these often under-funded arrangements, Congress compromised ERISA's preemptive control in this limited area, and recognized a permissive grant of regulatory authority to states to oversee the activities of MEWAs.[6] State authority over

---

**5.** The Texas Insurance Code does regulate fully-insured MEWAs, and authorizes them to act as insurance companies in Texas. Tex.Ins.Code Ann., art. 1.14-1, § 2(a)(7)(ii) (Vernon 1991). The reference to "fully-insured multiple employer welfare arrangement", contained in Art. 1.14-1, § 2(a)(7)(ii), incorporates the definition of that phrase set out in ERISA. 29 U.S.C.A. § 1144(b)(6). Both parties concede the Trust was not "fully-insured" for purposes of ERISA.

Even as to fully-insured MEWAs, however, the regulatory authority of the State Board of Insurance is not unfettered. Article 1.14-1, § 2(a)(7)(ii) provides that state law applies to fully-insured MEWAs only to the extent such law provides:

... (1) standards requiring the maintenance of specified levels of contributions, which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and (2) provisions to enforce such standards.

Tex.Ins.Code Ann., article 1.14-1, § 2(a)(7)(ii) (Vernon 1991). Self-insured MEWAs, of the type involved here, remain outside the statutory framework—no state regulatory scheme is in place in Texas for their licensing, or supervision.

**6.** The 1982 Amendments' grant of regulatory authority to the states was directed principally at establishing a basis for permitting state regulation of self-funded MEWAs, the subject of state regulators' greatest concern. Self-funded MEWAs, which qualified as employee welfare benefit plans, quickly slipped into the regulatory void created in 1974 by ERISA's adoption of its broad preemptive provision, § 514(a). Based on their "immunity" from state insurance requirements, multiple employer trusts could avoid state capitalization requirements, underwriting standards, and reserve requirements. Further, they were not subject to financial condition examination laws. The financial collapse of numerous uninsured multiple employer trusts and self-funded MEWAs prompted state regulators to make efforts to explicitly establish their jurisdiction over uninsured multiple employer trusts at the federal level. The pressures brought to bear by the state insurance commissioners led to the 1982 amendments to ERISA. H.R. 97-5470, 97th Cong., 2d Sess. at 30356-30358 (1982) (statement of Senator John Erlenborn); William J. Kilberg and Paul D. Inman, *Preemption Analysis of State Laws Relating to Employee Benefit Plans: An Analysis of ERISA § 514,* 62 Tex.L.Rev. 1313 (1984); David J. Brummond, *The Legal Status of an Insured, Non-Collectively-Bargained Multiple-Employer Welfare Trust Under ERISA and State Insurance Laws,* 28 Syracuse L.Rev. 701, 704, n. 15; 717, n. 91 (1977) citing articles relating to ERISA trust

MEWAs is now determined by whether a plan is insured or uninsured.[7]

Consistent with the permissive language provided in 29 U.S.C.A. § 1144(b)(6)(A)(ii), a number of states have enacted enabling legislation which authorizes regulation of the activities of self-insured MEWAs. Those states include, but are not limited to, Florida, (Fla.Stat.Ann. § 624.436–.44 (West Supp.1991)); Minnesota, (Minn.Stat.Ann. § 62H.01–08 (West Supp.1991)); and Hawaii, (Haw.Rev.Stat. § 393–1–51 (West 1985)), (see Congressional exemption from preemption, 29 U.S.C.A. § 1144(b)(5) and H.R. 97–5470, 97th Cong., 2d Sess. at 26902–26903 (1982). Texas has not followed the example of the above-mentioned states, and, at this time, has proposed no regulatory scheme for the licensing or supervision of self-funded MEWAs.[8]

Diamond cites an advisory opinion from the Department of Labor in support of its position that the Texas Insurance Code, at least in part, provides a regulatory scheme applicable to self-insured MEWAs.

Advisory Opinion 90–18A, CCH Pension Plan Guide, ¶ 23805K (Transf. Binder '89–'91). The advisory opinion identifies two principal areas where current state insurance regulation allegedly would not be inconsistent with ERISA: the areas of licensing and reporting requirements, and maintenance of levels of reserves and contributions. This Court disagrees that the advisory opinion of the Department of Labor is entitled to be given the force and effect of law. Advisory opinions, like revenue rulings and policies, do not have any more "binding or legal force than the opinion of any other lawyer". *Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1147 (5th Cir.1971) (citing *United States v. Bennett,* 186 F.2d 407, 410 (5th Cir.1951). They are recognized as tools of statutory construction, but not binding on the courts. However, even if the Court recognized the Department of Labor's advisory opinion as binding, the suggested boundaries for state regulation of self-funded MEWAs proposed by it are not

---

failures: David, *Employee Benefit Trusts' Growth Alarms Officials: More Failures Feared,* Bus. Ins., February 21, 1977, at 1; and David, *Self-Funded Trust Collapses; Deficit Could be for a Million Dollars,* Bus. Ins., April 4, 1977.

**7.** If the multiple employer welfare arrangement is fully insured, § 514(b) authorizes the states to regulate levels of reserves and contributions. *Id.* § 514(b)(6)(A)(i), 29 U.S.C.A. 1144(b)(6)(A)(i) (added by 1982 amendment). If the plan is less than fully insured, however, § 514(b) authorizes the states to impose any regulation "not inconsistent" with Title I of ERISA. *Id.* § 514(b)(6)(A)(ii), 29 U.S.C.A. § 1144(b)(6)(A)(ii) (added by 1982 amendment).

**8.** Though it is clear Congress intended to limit the preemptive effect of § 514(a) of ERISA on state laws relating to MEWAs, nothing in the legislative history of 29 U.S.C.A. § 1144(b)(6)(A) suggests that Congress, by its addition of the 1982 amendments, intended to nullify the effect of another already existing ERISA provision, the "deemer clause". 29 U.S.C.A. § 1144(b)(2)(B). The "deemer clause" provides that no employee benefit plan "shall be deemed to be an insurance company or other insurer ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts ..." Presumably, therefore, Congress did not intend to nullify it. *N.J. Transit Policemen's Benevolent Ass'n, Local 304 v. N.J. Transit Corp.,* 806 F.2d 451, 456 (3rd Cir.1986), cert.

denied, 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987) (abandonment of Congressionally articulated policy generally not presumed in the absence of some expression by Congress that abandonment is intended). In fact, 29 U.S.C.A. § 1144(b)(6)(A)(ii) specifically recognizes that ERISA's grant of regulatory authority to the states, relating to self-funded MEWAs, is limited by ERISA's other provisions (including the deemer clause), and may not be construed inconsistent with those other provisions.

Pursuant to the 1982 amendments to ERISA, states are authorized to regulate MEWAs, however, the expansiveness of this exception is limited by the "deemer clause". On its face, the deemer clause strongly suggests that, at a minimum, insurance legislation relating to licensed insurance companies may not be applied indirectly to MEWAs, and that enabling legislation consistent with 29 U.S.C.A. § 1144(b)(6)(A)(ii) is required. *Powell v. Chesapeake & Potomac Telephone Co. of Va.,* 780 F.2d 419 (4th Cir. 1985), cert. denied, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). For a non-restrictive application of the deemer clause as it relates to self-funded employee welfare benefit plans, see *Gonzales v. Prudential Ins. Co. of America,* 901 F.2d 446 (5th Cir.1990); *FMC Corp. v. Holliday,* —— U.S. ——, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *E–Systems, Inc. v. Pogue,* 929 F.2d 1100 (5th Cir.1991), reh'g den'd en banc, 935 F.2d 1293 (5th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 585, 116 L.Ed.2d 610.

comprehensive, and by no means the equivalent of the regulatory scheme set up for licensed insurance companies under the Insurance Code.

The gaps noted in the Texas regulatory system, relating to multiple employer welfare arrangements carry over into Texas' statutory procedures for liquidating them. Though the Texas Insurance Code contains an extensive array of provisions for the liquidation of licensed insurance companies, ranging from supervision to conservatorship and receivership, there are no statutory provisions for the liquidation of insolvent self-funded MEWAs. Because of their status under Texas law, as an unauthorized insurer, self-funded MEWAs remain outside the statutory framework for liquidation and rehabilitation. When questioned at length concerning the procedures for liquidating these ·entities, the Assistant Director of the Unauthorized Insurance Division of the State Board of Texas testified that there is no requirement under the Insurance Code that an insolvent self-funded MEWA be liquidated through an administrative proceeding. State intervention, under these circumstances, is entirely discretionary (Kyle deposition, pp. 6, 33–34), and, in fact, where the unauthorized insurer is insolvent and inactive, state intervention by the Insurance Board or the Attorney General is unlikely (Kyle deposition, p. 27). It is clear that the same supervisory and administrative safeguards afforded the liquidation of licensed insurance companies are not provided to these entities.

Most significantly, creditors of self-funded MEWAs are excluded from making claims against the Life, Accident, Health and Hospital Insurance Guaranty Association established by the state for the purpose of guaranteeing the payment of benefits and insuring continuation of coverage of insolvent licensed insurers. Kyle deposition, p. 34; Tex.Ins.Code Ann. art. 21.28–D (Vernon 1991). Specifically, Art. 21.28–D § 3(2)(g)(i) of the Insurance Code excludes self-funded multiple employer welfare arrangements defined by § 514 of ERISA. This fund, to which all licensed insurers are required to contribute, exists as an additional safeguard to insure performance of an insolvent insurer's contractual obligations. The Insurance Code's failure to include self-funded MEWAs as part of the Guaranty Fund highlights the fact that they are not classified as licensed insurers, or treated as the substantial equivalent of insurance companies under Texas law.

This Court follows *In re Morris Plan Co. of Iowa, supra,* and *First Am. Bank & Trust Co. v. George,* 540 F.2d 343 (8th Cir.1976), *cert. denied,* 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976), and finds that the difference in the Texas Insurance Code's regulatory and liquidation procedures is the crucial element in the determination of Debtor's eligibility for filing under the Bankruptcy Code. Both *Morris Plan Co. of Iowa* and *First Am. Bank & Trust Co.* emphasize that only those entities which have a comprehensive scheme of liquidation provided for by other statutes or regulations should be excluded from eligibility under the Bankruptcy Code. It appears to be the clear intent of Congress that those entities that do not enjoy such a scheme of liquidation should be able to avail themselves of the liquidation and reorganization provisions of the Bankruptcy Code. *Morris Plan Co. of Iowa, supra,* at 355.

The evidence adduced at the hearing suggests that significant differences exist between the regulatory and liquidation procedures in place for self-funded MEWAs and licensed insurers. In this instance, it appears that the Code, which provides a system for the orderly liquidation or reorganization of businesses, will be better able to administer this case.[9]

---

**9.** The lack of an extensive regulatory or liquidation scheme militates against finding that the Trust's business was public or quasi-public in nature. Diamond argues that Congress excluded domestic insurance companies (including MEWAs) from bankruptcy relief in recognition of the police powers vested in the states to protect the health and welfare of its citizens. Whatever general concern the state purportedly has in protecting claimants of self-insurers, it has taken no steps to transform what was essentially a private business enterprise into a public one. The lack of state regulations governing the activity of self-funded MEWAs indicates that the

Some examination is necessary to determine whether the Trust is the substantial equivalent of a domestic insurance company. That analysis requires comparison of the powers conferred upon or withheld from self-funded MEWAs, and licensed insurance companies under Texas law. *Matter of Cash Currency Exchange, Inc., supra; In re Cent. Mortg. & Trust, Inc., supra; First American Bank & Trust Co. v. George, supra.* Diamond relies heavily on the fact that self-funded MEWAs, like the Trust, perform functions similar to domestic insurance companies, and, therefore, should be treated as such. However, Diamond has misstated the test. To determine whether self-funded MEWAs are the substantial equivalent of licensed insurance companies, the Court looks only at the powers ascribed to the two entities by state statute. *In re Central Mortgage & Trust, Inc., supra.* It is clear, from the earlier discussion, that self-funded MEWAs are not authorized to act as insurers under Texas law, nor are they, at this time, subject to state regulation.

Even if this Court were to find that, through the exercise of *ultra vires* powers, the Trust engaged in insurance activity, that in and of itself, would not classify it as a "domestic insurance company" for purposes of § 109(b)(2) of the Bankruptcy Code. *Gamble v. Daniel,* 39 F.2d 447 (8th Cir.1930), *appeal dismissed,* 281 U.S. 705, 50 S.Ct. 464, 74 L.Ed. 1129 (1930), *cert. denied,* 282 U.S. 848, 51 S.Ct. 27, 75 L.Ed. 752 (1930); *In re Morris Plan Co. of Iowa, supra.* In *Gamble,* evidence that a trust company had engaged in banking activity, though statutorily prohibited from doing so, was not determinative on the issue of classification. The Eighth Circuit concluded that the Bankruptcy Act, in excluding banks from eligibility for relief intended to affect only those "corporations authorized by the laws of their creation to do a banking business". *Gamble, supra* at 450. Similarly, in the case at hand, the fact that the Trust, acting as a self-insurer, performs functions like a domestic insurance company, is not dispositive on the issue of eligibility for relief under Title 11.

Moreover, there is evidence that the functional analysis engaged in by courts plays an increasingly minor role in the state classification test. The court, in *In re Morris Plan Co. of Iowa, supra,* summarizes that position:

> ... As the distinction between financial institutions becomes increasingly blurred, this Court believes that the test for eligibility will become increasingly the test of whether there is a comprehensive scheme of liquidation outside the Bankruptcy Court. As banks set up insurance agencies, discount brokerage services, and lobby for the right to underwrite securities, while brokerage houses set up cash management accounts with services ranging from traveler's checks and credit cards to check writing privileges, it is going to become increasingly difficult to classify institutions on the basis of whether those institutions accept 'deposits' as that term has been historically used. However, this Court believes that the essential holding of *First American Bank & Trust Company v. George, supra,* is that there must be a comprehensive scheme of liquidation outside of the Bankruptcy Court to render an entity ineligible for Bankruptcy protection pursuant to 11 U.S.C. § 109(b)(2).

*In re Morris Plan Co. of Iowa, supra* at 356. This Court adopts the reasoning of *In re Morris Plan Co. of Iowa* on this point.

Under the state classification analysis, it is clear the Trust is not an excluded entity for § 109 purposes, however, continuing the analysis under the independent classification test would not change the result herein. Under that test, this Court engages in statutory construction of § 109(b)(2), itself, to determine whether the Trust meets the definition of a "domestic insurance company" or of any other institu-

---

state does not recognize the self-insurers' business activity as public in character. The losses suffered by claimants under the self-insurers' system are recognized by the state as no different from other investments left unprotected by state law. *In re Cent. Mortg. & Trust, Inc., supra* at 1019.

tion listed in § 109(b)(2). In applying that test to the Code provision, courts have adopted a common sense approach guided by legislative history and traditional rules of statutory construction. *In re Central Mortgage & Trust, Inc., supra; In re Family Health Services, Inc., supra.*

The entities excluded from eligibility for bankruptcy relief are specifically enumerated in § 109(b) of the Code. Courts have indulged in a presumption that Congress, in exempting certain entities from the operation of bankruptcy laws, narrowly circumscribed the limits of the exemptions. *In re Family Health Services, Inc., supra.* In reaching that conclusion, they place emphasis on Congress' failure to introduce the list of excluded entities with the words, "includes" or "including"—words which, under the Code's rules of construction, are not to be interpreted as limiting. 11 U.S.C. § 102; *Matter of Cash Currency Exchange, Inc., supra.* They treat the absence of the words, "includes" and "including", as indicative of Congress' intent that the list of excluded entities be exhaustive, not illustrative.

One court has rejected the position that § 109(b)'s insurance company exclusion was to be interpreted broadly, to cover entities similar to insurance companies. *In re Family Health Services, Inc., supra.* In reaching that conclusion, the court engaged in a close reading of the legislative history of § 109, and amendments to that provision. The court noted that Congress chose not to expand or modify the insurance company exception despite two opportunities for revision: First, when the Act was codified, and later, when § 109(b)(2) was amended in 1982. The insurance company exclusion remained unaltered, though Congress did modify and expand the definition of "bank" under § 109(b)(2) to include

six additional banking entities, or "similar institution[s] which is an insured bank". 11 U.S.C. § 109(b)(2). The court, in *In re Family Health Services, Inc.,* concluded that Congress' failure to amend the insurance company exception to include the words "substantially similar" to it, was indicative of its intent to narrowly construe that particular statutory exclusion.[10]

Having concluded that the Trust does not meet the definition of a "domestic insurance company", or of any of the other institutions listed in § 109(b)(2), the Court concludes that the Trust is not an excluded entity, and is an entity eligible for relief under Title 11.

### Conclusion

The test for determining eligibility for relief under Chapter 11 has caused more than one court to recite the old adage that "If it walks like a duck, quacks like a duck, and looks like a duck, it has got to be a duck". *In re Ophir Trust,* 112 B.R. 956 (Bankr.E.D.Wis.1990). Here, what looks like a duck is not a duck. Though, it is true that the Trust performs services similar to a domestic insurance company, based on the history of Debtor's operations, the Court determines that the Trust is a "person" for purposes of § 109(a), and is not specifically excluded from eligibility for relief under the Bankruptcy Code under the domestic insurance company exception. Diamond's motion to dismiss is OVERRULED.

---

**10.** The interpretation of § 109(b)(2) offered by *In re Family Health Services, Inc.* is consistent with the canons of statutory construction. Under ·traditional rules of statutory construction, the phrase "or similar institution" in § 109(b)(2) qualifies only the words that it immediately antecedes, and does not modify other preceding phrases in the series which are more remote, including "domestic insurance company[ies]". *T.I. McCormack Trucking Co., Inc. v. United*

*States of America,* 251 F.Supp. 526 (D.N.J.1966); *Quindlen v. Prudential Ins. Co. of America,* 482 F.2d 876 (5th Cir.1973). Next, the use of the disjunctive in § 109 indicates alternatives and requires that the alternatives be treated separately. Therefore, the phrase "similar institution" following the disjunctive "or" is inapplicable to the subject matter of the earlier preceding clause, "domestic insurance company". *Quindlen, supra* at 878.