**Sylvia CUTLER, et al., Plaintiff,**

v.

**The 65 SECURITY PLAN, Defendant.**

**Nos. CV 92 3491, CV 92 3621, CV 92 4054, CV 92 4124, CV 92 4402, CV 92 5329.**

United States District Court,
E.D. New York.

July 2, 1993.

---

John F. Byrne, Margolin & Meltzer, New York City, for Maimonides Hosp.

# 1010

Eileen M. Fields, Ronald E. Richman, Chadbourne & Parke, New York City, for the Employer Trustee.

Lawrence V. Kelly, New York City, for National Health Plan Corp.

Lowell Peterson, Meyer, Suozzi, English & Klein, Mineola, NY, for Union Members, Participants and Beneficiaries.

M. Jay Whitman, Associate Gen. Counsel, United Automobile, Aerospace & Agricultural Implement Workers of America, Detroit, MI, for the Intern. Union.

Eugene Eisner, Fannette Pollack, Eisner, Levy, Pollack & Ratner, New York City, for defendant.

Michael S. Gordon, Counsel to Dist. 65 Security Plan, Washington, DC, Michael D. Felson, Solicitor's Office, U.S. Dept. of Labor, Boston, MA, amicus curiae.

## CORRECTED PRELIMINARY MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

## TABLE OF CONTENTS

I. FACTS .................................................................. 1011
II. LAW .................................................................. 1013
   A. Power of the Court to Stay Federal and State Proceedings ............ 1013
   B. Eligibility of the Trust for Bankruptcy Protection .................... 1014
      1. Generally ................................................... 1014
      2. Law Governing ............................................. 1014
      3. Applicability to Employee Benefit Plans ..................... 1017
      4. District Court's Jurisdiction Over Bankruptcy Proceedings .......... 1018
      5. Desirability of Bankruptcy for the Fund ....................... 1018
   C. Receivership ....................................................... 1019
   D. Class Action ....................................................... 1020
      1. Opt-out Class Action ........................................ 1020
      2. Mandatory Class Action ..................................... 1020
      3. Use of Subclasses .......................................... 1021
   E. Quasi Bankruptcy as a Federal Common Law Remedy ............... 1021
   F. Negotiated Settlement .............................................. 1023
III. APPLICATION OF LAW TO FACTS ................................... 1023
IV. CONCLUSION ......................................................... 1024

---

Defendant's motion for a preliminary stay of all state and federal proceedings against it or its participants or beneficiaries is granted. The court's action is necessary in aid of its jurisdiction in order to protect the limited assets of The 65 Security Plan (the "Fund" or "Plan") while an equitable plan for their distribution is devised. Arguably the Fund is 1) eligible for bankruptcy protection or 2) a receiver may be appointed or 3) a mandatory or 4) opt-out class action can be utilized or 5) a form of "quasi bankruptcy" under federal common law is possible. Any of these devices will enable the court to protect the rights of all creditors of the Fund. Some will more expeditiously provide exigent relief to those with health claims and to health care providers, while protecting the rights of em-

ployers and employees presently contributing to the Fund, with less transactional costs. For the moment a choice need not be made since the most desirable way to proceed is by voluntary settlement, if that is possible. The Honorable Milton Mollen is appointed Special Master to assist in maximizing the Fund's assets and to develop a suitable plan for their distribution after consulting with all parties and assisting them in resolving any differences. While the negotiations proceed, the parties may consider alternate legal devices to fix terms of any settlement in a fair and reasonable way. Without making a final decision on what devices would be appropriate, they have been set out below with a preliminary analysis to assist the parties in their discussions.

## I. FACTS

These six Eastern District cases, consolidated by order of this court dated March 24, 1993, reflect one aspect of the critical crisis in health care facing this nation. They involve claims against the Plan by health care providers and Plan participants or beneficiaries for medical services. The Plan does not appear to have funds on hand sufficient to pay all current and prospective claims.

The Plan is a Taft–Hartley multiemployer trust fund, established and maintained pursuant to section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). It is an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. Established in 1945, the Fund provides welfare benefits to members of a now defunct local of the United Automobile, Aerospace & Agricultural Implement Workers of America (the "UAW"). The members are largely unskilled and semiskilled employees of the garment center and direct mail shops. Over the years, at least six hundred different employers contributed to the plan on behalf of some forty to fifty thousand participants and beneficiaries. Currently, because of a substantial decrease in union membership due to loss of jobs, only approximately one hundred and fifty different employers now contribute or will contribute to the plan on behalf of some 2,500 to 10,000 participants and beneficiaries.

Over the last several years the Fund has been overwhelmed by the increase in the cost of providing medical benefits to its participants. The downturn in the economy has resulted in contributing employers being unable to adequately support the health benefits provided to participants and beneficiaries. There is now a significant deficit in the Fund. Despite cost-savings measures initiated by the Fund's trustees over the years, by June 1991, more than $30 million was owed to participants and beneficiaries for expenses covered by the fund. There may be as many as 160,000 claims outstanding against the Fund for payment of medical expenses to participants, beneficiaries and health care providers. Failure to pay these claims contributes to the crisis facing many health care providers.

The Fund's assets are being further depleted by the costs of defending and settling hundreds of lawsuits. There are currently 133 cases pending in New York state and federal courts. At least 112 cases are pending in courts in New Jersey. Still other cases are pending in four other states. Claims in the cases against the fund total at least $4 million. Transaction costs in attorneys fees and in conducting discovery are great and growing.

The Fund has two trustees. One represents management; the other represents the union. They have overall responsibility for the Fund. There are no allegations of fraud or mismanagement. A comptroller and independent accounting firm are employed. The Fund has utilized the services of an experienced impartial arbitrator in an attempt to resolve some of its problems.

Since August 1992, the Fund's day-to-day operations have been administered by a Chief Executive Officer with twenty-five years of experience in the field of union benefit funds. He has been charged with restructuring the offices of the Fund. He has attempted to achieve settlements with some creditors and to secure uncollected employer contributions. Under his guidance, the staff of one hundred and twenty has been reduced to twenty. Those who remain have been attempting to handle new claims and computerize the system for the future while at the same time trying to liquidate the past debt. The reduced-staff is inundated with the voluminous paperwork associated with discovery requests. They are also handling hundreds of phone calls daily.

Some of the records of the Fund have been subpoenaed by the federal government in connection with a grand jury investigation. The United States Department of Labor has been reviewing problems faced by the Fund. It has urged the Fund to take the necessary steps to avoid waste of essential assets and to resolve the problems facing the Fund with judicial assistance.

In light of the difficulties associated with the Fund, the union is in the process of entering into a new plan for its dwindling membership. New premiums are being col-

lected from employers through a surcharge program to try to liquidate past debt. These monies are segregated to pay claims for the members in the particular shops on behalf of whom the surcharge is paid.

From February 1991 to October, 1992, when its services were terminated, National Health Plan Corporation ("NHP") served as third party administrator of the medical and hospital plans of the Fund. NHP not only processed claims, but also served as a participating provider organization, providing discount health care services to Fund participants. NHP claims it is owed approximately $18 million dollars in unpaid claims and another $667,000 in fees. It is preparing to file a class action suit on behalf of all participants and providers.

Unquestionably this litigation presents a medical and legal emergency, affecting thousands of people and providers who are hurting financially. The potential transaction costs in the pending litigation could exhaust the Fund's assets and deny recovery to people in need. The plethora of current and potential cases will further clog the courts and result in delays to those claimants who need help.

The Fund moves 1) to appoint a Special Master; 2) to marshall its assets and oversee payment of its obligations and; 3) to stay all current and future federal and state court litigation against the Fund and its trustees, and all actions against participants and beneficiaries of the Fund, pursuant to the All Writs Act, 28 U.S.C. § 1651.

The court issued a preliminary memorandum and order on May 27, 1993, inviting the Government to appear as *amicus curiae.*

A hearing was held on June 7, 1993. All parties present were given an opportunity to express their views. It was apparent based on information then before the court, that the Fund's present and potential assets constitute a small percentage of the claims against it. There was general agreement among those present that prompt judicial intervention was needed to maximize the distribution of the limited assets of the Fund in an equi-table manner at the lowest possible cost as quickly as possible.

The court issued the following order:

1. All pending actions, state and federal, against the Fund, its trustees or other fiduciaries and participants or beneficiaries are stayed. Any action filed after the date of this order will also be stayed.

2. The following "subclasses" are denominated only for the purpose of assisting the parties and Special Master in discussing settlement:

    a. Third-party administrators to the Fund;

    b. Hospitals that provided services to participants or beneficiaries of the Fund;

    c. Individual, non-hospital health care providers that provided services to participants or beneficiaries of the Fund;

    d. Employers who contributed to the Fund pursuant to collective bargaining agreements or written agreements with District 65, U.A.W. (the "Union");

    e. Current and former participants and beneficiaries of the Fund;

    f. Unions, including local unions formerly associated with the Union and the International U.A.W.;

    g. Employees of the Fund;

    h. Other creditors of the Fund.

3. Steven Nickerson will continue as Chief Executive Officer of the Fund. The current staff of employees will be maintained to answer the large volume of telephone calls that is anticipated.

4. All payments by the Fund are stayed except for labor and rent and routine office expenditures under paragraphs 3 and 5. The Chief Executive Officer will continue processing claims and segregating funds associated with future claims. It is hoped that payments of future claims from those segregated funds will resume shortly.

5. Counsel to the Fund will arrange for notification of attorneys and courts in all pending cases of the effect of this order. Notice is to be provided by first class mail or facsimile as soon as practicable. Costs of notification will be paid by the Fund.

6. The court appoints the Honorable Milton Mollen as Special Master. Judge Mollen has had a distinguished legal career for the past forty-three years. A summary of his accomplishments is attached as Appendix A. Payment for Judge Mollen's services at a reduced rate of $250 an hour and $150 an hour for paraprofessionals will be paid by the Fund after approval by the magistrate judge.

7. While paragraph 2 refers to "subclasses" this is not now a class action, but, preliminarily, in the nature of a "quasi bankruptcy" proceeding. An opinion will follow explaining these terms.

## II. LAW

### A. *Power of the Court to Stay Federal and State Proceedings*

■ The Anti–Injunction Act prohibits a federal court from staying pending state court proceedings "except as expressly authorized by Act of Congress, or when necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. *See Standard Microsystems Corp. v. Texas Instruments Inc.*, 916 F.2d 58, 60 (2d Cir. 1990). It does not affect the federal court's power to enjoin future state actions or actions in other federal courts. *See Dombrowski v. Pfister*, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965).

The All–Writs Act empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The Act authorizes a court, in "exceptional circumstances to issue such orders 'who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'" *Benjamin v. Malcolm*, 803 F.2d 46, 52 (2d Cir.1986), *quoting*, *United States v. New York Telephone Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977).

■ As this court has already observed:

Courts have interpreted the "necessary in aid of jurisdiction" exception liberally "to prevent a state court from . . . interfering with a federal court's flexibility and authority" to decide the case before it. *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970); see *In re Baldwin–United Corp.*, 770 F.2d 328 (2d Cir.1985) (same); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334 (5th Cir.1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982) (same); *see also* Redish, *The Anti–Injunction Statute Reconsidered*, 44 U.Chi. L.Rev., 717, 754 (1977) ("necessary in aid of jurisdiction" exception should be construed "to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory.").

The Second Circuit has recognized that a stay of proceedings in state court is appropriate under the "necessary in aid of jurisdiction" exception "where a federal court is on the verge of settling a complex matter, and state court proceedings undermine its ability to achieve that objective." *Standard Microsystems Corp. v. Texas Instruments Inc.*, 916 F.2d 58, 60 (2d Cir.1990) (stay is appropriate to allow district judge to "legitimately assert comprehensive control over complex litigation"); *In re Baldwin–United Corp.*, 770 F.2d 328, 337 (2d Cir.1985) (court can issue injunctions against actions that would "frustrate the district court's efforts to craft a settlement") . . . .

*In re Joint E. & S. Dists. Asbestos Litig.*, 134 F.R.D. 32, 37 (E. & S.D.N.Y.1990) (staying state and federal court proceedings under the authority of the All–Writs Act in the context of asbestos class action litigation). Where the public interest and large numbers of people are involved, courts may go even farther to fashion broad remedies. *See Golden State Bottling Co. Inc. v. National Labor Relations Board*, 414 U.S. 168, 179, 94 S.Ct. 414, 422, 38 L.Ed.2d 388 (1973); *United States of America v. State of Washington*, 459 F.Supp. 1020, 1115 (W.D.Wash.), *appeal dismissed*, 573 F.2d 1117 (9th Cir.1978).

**1014**

The All–Writs Act authorizes a federal court to stay federal and state litigation against an insolvent welfare fund where the court's efforts to prevent further damage to members would be "rendered meaningless" if creditors and members who have filed suit are able to obtain judgments against it. *In re Consolidated Welfare Fund "ERISA" Litigation*, 798 F.Supp. 125, 128 (S.D.N.Y.1992) (stay is akin to the automatic stay that applies in the bankruptcy context, 11 U.S.C. § 362, that protects the fund's assets during an interim period). *See also General Motors Corp. v. Buha*, 623 F.2d 455, 458–59 (6th Cir.1980) (injunction against state proceedings expressly authorized by ERISA where state court action will prevent fiduciary of pension plan from carrying out responsibilities under ERISA); *Senco of Florida, Inc. v. Clark*, 473 F.Supp. 902, 905 (M.D.Fla.1979) (Congress intended ERISA to come within the "expressly authorized" exception to Anti–Injunction Act). *But see, e.g.*, finding no express authorization in ERISA: *1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc. v. Nobers*, 968 F.2d 401, 410 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1066, 122 L.Ed.2d 370 (1993) (*Buha* distinguishable on its facts). The Anti–Injunction Act is not applicable where a federal agency requests a stay of state court proceedings. *Securities and Exchange Commission v. Wencke*, 622 F.2d 1363, 1368 (9th Cir.1980).

Given the court's power to stay all actions against the Fund, a question remains as to what procedure the court could adopt to assist the parties in achieving a quick and fair settlement of the case with the lowest possible transaction costs.

B. *Eligibility of the Trust for Bankruptcy Protection*

1. Generally

One option is bankruptcy. "Business trusts" can be debtors in bankruptcy. *See* 11 U.S.C. § 101(9)(A)(v). *See also In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 153 B.R. 409, 412 (Bankr. S.D.N.Y.1993); *In re Westchester Cty. Civ. Serv. Employees Ass'n. Benefit Fund*, 111 B.R. 451, 456 (S.D.N.Y.1990); *In re Universal Clearing House Co.*, 60 B.R. 985, 991 (D.Utah 1986). Such trusts are eligible as debtors because Congress recognized their similarity to corporations. *In re Woodsville Realty Trust*, 120 B.R. 2, 3 (Bankr.D.N.H. 1990); *In the Matter of Captran Creditors Trust*, 53 B.R. 741, 743 (Bankr.M.D.Fla. 1985).

The Bankruptcy Code does not define the term "business trust." *See* 11 U.S.C. § 101(9)(A)(v). Nor is the legislative history instructive. *See* 1978 U.S.Code Cong. & Admin.News 5787, 6266. The term "business trust" replaced the following language used in Section 1(8) of the Bankruptcy Act of 1898: "... any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by a certificate or other written instrument." *See* 2 Collier on Bankruptcy ¶ 101.09 (15th ed. 1993). The change, it has been suggested, evinced Congressional intent to permit "a broader variety of trusts to obtain relief in the bankruptcy courts." *In re Treasure Island Land Trust*, 2 B.R. 332, 334 (Bankr.M.D.Fla.1980). *See also In re Tru Block Concrete Products, Inc.*, 27 B.R. 486, 488 (Bankr.S.D.Cal.1983) ("Congress has made it possible for a more diverse assortment of trusts to qualify as debtors."). A considerable amount of case law has been devoted to establishing which trusts fall within this category. A uniform body of law has not resulted. The decisions are, in fact, "hopelessly divided." *In re Village Green Realty Trust*, 113 B.R. 105, 108 (Bankr. D.Mass.1990).

2. Law governing

A preliminary question is whether a business trust is defined by state law or federal law. There is conflicting law on this issue.

A few courts have held that state law governs. *See, e.g., In re Heritage North Dunlap Trust*, 120 B.R. 252, 254 (Bankr. D.Mass.1990) ("Since the Code does not define what constitutes a business trust, we look to state law."); *In re Constitutional Trust # 2–562*, 114 B.R. 627, 631 n. 12 (Bankr.D.Minn.1990) (court is obliged to follow state statutory definition of business trust); *In re Village Green Realty Trust*, 113 B.R. 105, 114 (Bankr.D.Mass.1990) (court unable to "ignore" the nominee trust's inability

to qualify as a business trust under Massachusetts law). *But, cf.,* explicitly rejecting state law approach, *In re Woodsville Realty Trust,* 120 B.R. 2, 5 n. 2 (Bankr.D.N.H.1990) ("[I]n the absence of any explicit contrary Congressional intent, the Bankruptcy Code definition of qualified trust debtors was to be developed on a uniform national basis by case-by-case adjudication."); *In the Matter of Arehart,* 52 B.R. 308, 310 (Bankr.M.D.Fla. 1985) (failure to register trust as required by Florida state law is "without legal significance" in determining whether entity is a business trust).

New York defines a business trust as "any association operating a business under a written agreement or declaration of trust, the beneficial interest under which is divided into shares represented by certificates." N.Y.Assoc.Law § 2.2. *See Limouze v. M.M. and P. Maritime Advancement, Training, Ed. and Safety Prog.,* 397 F.Supp. 784 (D.Md.1975) (issuance of certificates or shares by trust required for business trust characterization under New York law); *Denmark Cheese Ass'n v. Hazard Advertising Co.,* 59 Misc.2d 182, 298 N.Y.S.2d 98 (Sup.Ct. N.Y.Cty.), *modified on other grounds,* 33 A.D.2d 761, 305 N.Y.S.2d 1019 (1st Dep't 1969) (a business trust is an entity used to make a profit).

Under traditional New York State law, the Fund would arguably not qualify as a business trust. Its failure to have the beneficial interest divided into shares represented by certificates might be fatal to a New York business trust characterization. *See Limouze v. M.M. and P. Maritime Advancement, Training, Ed. and Safety Prog.,* 397 F.Supp. 784 (D.Md.1975).

A competing, more extensive, and generally more persuasive body of law has relied on the need for national uniformity and vindication of the federal bankruptcy policy to fashion a definition of "business trust." As one court reasoned,

> Whether an entity is eligible for relief under title 11 of the United States Code is purely a matter of federal law. To hold otherwise would result in different results in different states and an entity would be eligible for relief in one state but not in

another. Clearly this is not what Congress intended when it enacted Article I, § 8, Cl. 4 of the Constitution, which provides that "Congress shall have the power ... to establish ... uniform laws on the subject of bankruptcies."

*In the Matter of Arehart,* 52 B.R. 308, 310–11 (Bankr.M.D.Fla.1985).

Although courts applying federal law have used different analyses to determine whether an entity is a business trust, as described below, nearly all courts look to the trust instrument for some guidance. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710, 853 (E. & S.D.N.Y.1991), *rev'd on other grounds,* 982 F.2d 721 (2d Cir.1993) (question of whether Manville Personal Injury Settlement Trust, a New York State trust, was a business trust under federal common law not reached); *In re Carriage House, Inc.,* 120 B.R. 754 (Bankr.D.Vt.1990), *aff'd,* 146 B.R. 352 (D.Vt.1992); *In re Universal Clearing House Co.,* 60 B.R. 985 (Bankr. D.Utah 1986); *In the Matter of Arehart,* 52 B.R. 308 (Bankr.M.D.Fla.1985).

Some courts have ruled that only trusts with the attributes of a corporate profit making entity may be termed "business trusts."

> The basic distinction between trusts and nonbusiness trusts is that business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit; the object of a nonbusiness trust is to protect and preserve the trust res. The powers granted in a traditional trust are incidental to the principal purpose of holding and conserving particular property, whereas the powers within a business trust are central to its purpose. It is the trust's similarity to a corporation that permits it to be a debtor in bankruptcy.

*In re Treasure Island Land Trust,* 2 B.R. 332, 334 (Bankr.M.D.Fla.1980). *See also In re Village Green Realty Trust,* 113 B.R. 105, 114 (Bankr.D.Mass.1990) ("Since the Code defines a corporation to include a business trust, it stands to reason that a business trust should have at least some of the indicia of a corporation."); *See also In re Woodsville Realty Trust,* 120 B.R. 2, 4 (Bankr.D.N.H.

1990); *In re Ralph Faber Trust,* 113 B.R. 599, 600–01 (Bankr.D.N.D.1990); *In re North Shore Nat'l Bank of Chicago,* 17 B.R. 867, 870 (Bankr.N.D.Ill.1982).

Other courts have culled the characteristics of a business trust from the test for Internal Revenue Code purposes set forth in *Morrissey v. Commissioner,* 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). To qualify as a business trust under this analysis 1) the trust must have been created and maintained for the purpose of conducting a business and sharing profits; 2) the trustees must hold title to the property; 3) there must be centralized management; 4) the continuity of beneficial interests must be uninterrupted by death of the beneficial owners; 5) beneficial interests must be transferable without affecting the continuity of the enterprise; and 6) personal liability of the participants must be limited. *Id.* at 359, 56 S.Ct. at 296. *See, e.g., In re Constitutional Trust # 2–562,* 114 B.R. 627, 631 (Bankr.D.Minn.1990); *In re Betty Hays Trust,* 65 B.R. 665, 668 (Bankr.D.Neb. 1986); *In the Matter of Cohen,* 4 B.R. 201, 208 (Bankr.S.D.Fla.1980).

A more practical approach has been utilized by courts that have focused primarily on the trust's operations in administering funds or a business to provide profits or an increase in assets for beneficiaries. These courts have interpreted the less restrictive language of current Code, which eliminates the requirement that trust ownership be evidenced by certificates or written instruments, as an invitation to depart from the traditional tests for business trusts. *See, e.g., In re Medallion Realty Trust,* 103 B.R. 8, 11–12 (Bankr.D.Mass.1989), *aff'd,* 120 B.R. 245 (D.Mass.1990) ("simpler test" of business trust is "whether the trust was created to transact business for the benefit of investors [or beneficiaries] ... without regard to whether the trust has the characteristics of a corporation"); *In re Universal Clearing House Co.,* 60 B.R. 985, 992 (Bankr.D.Utah 1986) (critical inquiry is not whether trust ever made a profit, but rather the type of activity for which the trust was designed); *In the Matter of Captran Creditors Trust,* 53 B.R. 741, 744 (Bankr.M.D.Fla.1985) (although normal indicia of doing business are lacking, and the trust was not created to generate

profits, the fact that the trustees managed assets to maximize payoff to creditors is sufficient to characterize entity as business trust); *In re Tru Block Concrete Products, Inc.,* 27 B.R. 486, 491 (Bankr.S.D.Cal.1983) ("Extending the protections of the bankruptcy law to [a liquidating trust] is consistent with the remedial nature of the such laws, deserving of liberal application."). *See also In re Secured Equipment Trust of Eastern Air Lines, Inc.,* 153 B.R. 409, 413 (Bankr. S.D.N.Y.1993) ("A trust, in order to be characterized as a business trust, must also transact business for the benefit of investors.").

This more modern case-by-case analysis is in keeping with a liberal interpretation of the bankruptcy laws.

Any consideration of the matter requires that the court look at perhaps the most important trust now before the court—the Manville Personal Injury Settlement Trust (the "Manville Trust"). In *In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710, 853 (E. & S.D.N.Y.1991), *rev'd on other grounds,* 982 F.2d 721 (2d Cir.1993) this court expressed some doubt as to whether the Manville Trust, a New York State liquidating trust, was a business trust. At that time the court reasoned that because the trust "was established to compensate persons injured by Manville's asbestos rather than as a business enterprise or to hold assets," it "may not fall within the definition of a business trust." *Id.* The Second Circuit, however, recently left the door open for business trust eligibility for the Manville Trust, when it suggested that the court and parties examine alternative procedures to the class action settlement "such as Chapter 11 proceedings for the Trust itself, if it qualifies as a business trust." *In re Joint E. & S. Dists. Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir.1992).

Upon further analysis, and utilizing the more modern case-by-case approach adopted in recent cases, the court would be more likely to conclude that eligibility of the Manville Trust as a business trust is arguable. The trustees are doing more than simply holding and preserving assets. They, in fact, control multibillion dollar businesses whose

primary concern is to maximize the Trust's assets to provide for the largest recovery possible to a maximum number of claimants. Large numbers of employees are required to run the enterprise. The hundreds of thousands of claimants are in the position of stockholders receiving dividends on their claims. In addition to investment concerns, the trustees are involved with such typically corporate notions as governance, productivity and public relations. They employ financial advisors and participate in public stock offerings. Its trustees sit both on the Manville corporate board the board of a subsidiary. The Trust is the majority shareholder of the Manville corporation. The Manville Trust clearly transacts business to maximize the payoff to creditors. Its aim is financial gain. The transactions are of the nature typified as doing business.

The highly significant Texas decision, *In re Affiliated Food Stores, Inc., Group Benefit Trust,* 134 B.R. 215 (Bankr.N.D.Tex.1991), expanding "business trust" characterization under the bankruptcy law, is discussed below. At the moment it need only be noted that Chief Bankruptcy Judge Lifland of the Southern District of New York is well aware of this expanded approach. *See In re Secured Equipment Trust of Eastern Air Lines, Inc.,* 153 B.R. 409, 412–13 (Bankr. S.D.N.Y.1993) (Lifland, J.).

### 3. Applicability to Employee Benefit Plans

The question remains whether a trust to provide employee health benefits may qualify as a business trust under any of these approaches. Most of the courts that have applied the more traditional business trust analysis to employee benefit funds have denied them bankruptcy relief. *See, e.g., In re Consolidated Welfare Fund "ERISA" Litigation,* 798 F.Supp. 125, 128 n. 4 (S.D.N.Y. 1992) (employee benefit plans not eligible for protection under the Bankruptcy Code); *In re Westchester Cty. Civ. Serv. Employees Ass'n. Benefit Fund,* 111 B.R. 451, 456 (S.D.N.Y.1990) (trust fund conducts no business activities and generates no business profits); *In re John M. Cahill, M.D. Associates Pension Plan,* 15 B.R. 639 (Bankr. E.D.Pa.1981) (pension plan beneficiaries do not hold an interest in the nature of a corporation).

A contrary result, however, was reached in the persuasively analyzed case of *In re Affiliated Food Stores, Inc., Group Benefit Trust,* 134 B.R. 215 (Bankr.N.D.Tex.1991). The court, focusing on the type of activity for which the trust was designed, concluded that a self-funded employee benefit plan, administered through a third party plan administrator, whose stated purpose was to provide and maintain health benefits for employees of member stores, qualified as a business trust. The court reasoned:

> [The Trust's] business activity entailed collecting and receiving employee contributions from member stores ... and paying claims made by employees of member stores and their families.
>
> The type of business activity described in the trust instrument contrasts sharply with that of donative trusts, entities traditionally excluded by the Bankruptcy Act and Code from the category of business trusts. Here Debtor's principal purpose is not effectuating a settlor's estate plan through the preservation of a trust res. The purpose of its business activity is designed to lower costs of health care coverage for member stores. Debtor does not merely hold title to funds and attempt to preserve them for the benefit of member stores' employees. Through pooling the assessments paid by the member stores, it provides health care coverage for member stores' employees at financial discount. Debtor analogizes its business activity to that of a large volume purchaser of medical services, such as an HMO, which, through arrangements made with health care providers, is able to control costs for its enrollees. The lowered health costs represent a tangible financial benefit realized by both the member stores and the Trust beneficiaries, whose claims are paid through this system.

*Id.* at 218 (citations omitted). The court also considered the lack of restriction on the transferability of the beneficiaries' interests, its centralized management and its liability limited to its assets on hand. *Id. See In re Michigan Real Estate Ins. Trust,* 87 B.R.

447, 449 (Bankr.E.D.Mich.1988) (real estate trust funded for the purpose of reducing health care costs for members qualifies as business trust).

The sound reasoning of *Affiliated Stores* is particularly applicable to the Plan and other like arrangements. Providing health care benefits to employees is a major activity of American business, involving substantial allocations of funds. *See* Peter Passell, *Health Care's Fever: Not So High To Some*, N.Y. Times, May 16, 1993 at D3 (soaring health care premiums are major factor in inability of American business to compete in world markets); Michael Kelly, *Hillary Clinton Hears the People, Invitation Only*, N.Y. Times, Mar. 13, 1993 at A7 (small companies are being driven out of business because of mounting health care costs); Pat Costello Smith, *Health Care Costs Shifting to Workers*, N.Y. Times, Feb. 11, 1990 at 12L1 at 1 (cost of health benefits is fastest growing component of the cost of labor); Glenn Kramon, *Small Business is Overwhelmed by Health Costs*, N.Y. Times, Oct. 1, 1989 at A1 (cost of health care to businesses so great that many small businesses can no longer afford insurance); Fred K. Foulkes and Robert D. Paul, *Containing Retiree Health Care Expenses*, N.Y. Times, Nov. 29, 1987 at C2 (providing health care to retired workers is an $85 billion business).

A health care trust might be likened to jointly owned subsidiary of a business. It takes the place or private or self-funded insurance which must be characterized as a business in nature. In fact, the expenses of insurance and health care are a major factor in many bankruptcies. The Plan and other analogous plans are founded on the belief that they are an administratively efficient method of assisting groups of employers in supplying health care benefits to large pools of employees at reduced costs. Without such collaborative practices, the already almost unmanageable costs of health care would undoubtedly be even higher. To the small employers and unions that generally take advantage of such devices, these plans are critical business arrangements.

### 4. District Court's Jurisdiction Over Bankruptcy Proceedings

Should the parties opt for bankruptcy of the Fund the court could retain jurisdiction over the matter. District courts have original jurisdiction over all matters arising under the bankruptcy laws. 28 U.S.C. § 1334. *See In re Kaiser*, 722 F.2d 1574, 1758 (2d Cir. 1983). Pursuant to 28 U.S.C. 157(a), the Eastern District of New York issued a Standing Order on August 5, 1986, automatically referring all bankruptcy cases and proceedings to the bankruptcy judges of the District. *See In re Southold Development Corp.*, 129 B.R. 18, 20 (E.D.N.Y.1991). The court may, however, on its own motion, withdraw its reference of a case to the bankruptcy court and retain original jurisdiction. 28 U.S.C. § 157(d). *See In re Southold Development Corp.*, 129 B.R. 18, 20 (E.D.N.Y. 1991). Withdrawal is appropriate "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). The special circumstances of the case, and the interplay of trust law and ERISA would make it appropriate for the court to consider exercising its withdrawal power under 28 U.S.C. § 157(d).

### 5. Desirability of Bankruptcy for the Fund

Assuming *arguendo* that the Fund qualifies as a business trust, statutory bankruptcy protection is not necessarily desirable. "From the practical point of view, probably one of the least successful ways for a creditor to collect money from a debtor is to put the debtor into bankruptcy." Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 380 (1961).

A formal bankruptcy proceeding, with all its complexity, is normally characterized by great delay and expense. *See* Kenneth H. Bacon, *Losses in Bankruptcies Spurs Lenders to Strive to Protect Themselves*, Wall St. J., June 17, 1993 at A1. *See also* Edward A. Adams, *Bankruptcy Fees Here are Highest in Nation: Studies: Billing Rates Higher, Proceedings Take Longer Here*, N.Y.L.J., June 24, 1993 at 1 (describing how in New York bankruptcy cases fees are higher and

delays greater than anywhere else in the nation). A bankruptcy would, probably, add years to the final resolution of the Fund's problem. "[B]ankruptcies ... can turn into marathons, often enriching armies of lawyers and accountants at the expense of creditors." *Id.* Legal fees will be compounded, further draining the assets that creditors are entitled to share.

· A privately agreed upon plan is generally "cheaper, quicker and economically better for all parties." *See* Sharon Walsh and David S. Hilzenrath, *Workouts: Avoiding the Big Bite of Bankruptcy,* Wash.Post, Sept. 6, 1990 at E1 (describing efforts by real estate magnates to work privately with lenders to keep their companies out of bankruptcy court with its concomitant great expense and delay). *See also* Jayne Levin, *Cleaning Up the Mess: The Need for Bankruptcy Reform,* Investment Dirs. Digest, Apr. 16, 1990 at 18 (describing how the legal framework of bankruptcy can actually worsen situations and discussing possible reforms).

A possible compelling reason to avoid formal bankruptcy protection is the uncertainty of the status of health care coverage. "Compared with other benefits, such as pensions, which have legal protections, 'health benefits are an entirely different kettle of fish.... They are a real mess in bankruptcy. There's a good chance that people are going to lose their benefits.'" Carol M. Ostrom, *Another F & N Casualty: Health Insurance—Bankruptcies Can Kill Coverage,* Seattle Times, Mar. 9, 1992 at A1 (quoting bankruptcy attorney discussing tenuous status of health care coverage when companies go bankrupt). Moreover, given the uncertainty of the Fund's eligibility for business trust status, throwing the Fund into bankruptcy might lead to long appellate delays.

### C. *Receivership*

"Equity has jurisdiction over trust estates. A non-judgment creditor, claimant or beneficiary, a party in interest, may file an appropriate bill in equity, and ... have a receiver appointed to protect the property." 1 Ralph Ewing Clark, *The Law and Practice of Receivers* § 155 (3d ed. 1959). A non-judgment creditor "has a right to have the fund properly handled and properly distributed when time of distribution arrives." *Id.* at § 200. *See, e.g., Marshall v. Snyder,* 572 F.2d 894, 896 (2d Cir.1978) (approving appointment of a receiver by the district court until new trustees could be installed); *Porter v. Teamsters Health, Welfare and Life Insur. Funds of Philadelphia & Vicinity et al.,* 321 F.Supp. 101, 104 (E.D.Pa.1970) (district court empowered to enjoin the making and receipt of contributions, to appoint a receiver, to allow an accounting and to render a declaratory judgment). *See generally* 4 Ralph Ewing Clark, *The Law and Practice of Receivers* § 999.1 *et seq.* (3d ed. 1959).

■ A federal court has power in equity to appoint a receiver. Fed.R.Civ.P. 66. *See generally* Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1781 *et seq.* (1973). It is within a court's discretion to appoint a receiver to protect the public interest by preventing diversion or waste. *Commodity Futures Trading Commission v. Morgan, Harris & Scott, Ltd.,* 484 F.Supp. 669, 677 (S.D.N.Y.1979) (appointing receiver over defendant's assets which might be necessary to compensate defrauded investors).

■ Because receivership interferes with an individual's property rights by ousting him from control, the appointment of a receiver is an extraordinary remedy that should only be utilized where there is a clear necessity to protect a party's interest in property. *Id.* at § 1783. *See, e.g., Gordon v. Washington,* 295 U.S. 30, 39, 55 S.Ct. 584, 589, 79 L.Ed. 1282 (1935) (appointment of receiver appropriate only where there is a threatened loss or injury to property which only receivership would avoid); *Ferguson v. Tabah,* 288 F.2d 665, 674 (2d Cir.1961) (receivership is a "drastic remedy" to be imposed "only where no lesser relief will be effective").

The drastic remedy of receivership would seem to present grave dangers of inappropriateness. There is no allegation of waste or mismanagement by the trustees or the Fund administrator. To the contrary, all concerned agree that the Fund management is doing its utmost to preserve the Fund's limit

assets and to attempt to recoup monies owed to it. There appears at the moment no proof of danger that the assets of the Fund will be lost if they are permitted to remain under the control of the Fund's current management team. Mere consideration by a grand jury of records of the Fund has no probative value.

### D. *Class Action*

Another procedural possibility for resolving the Fund's problems is a class action. *See* Fed.R.Civ.P. 23; *Manual for Complex Litigation 2d* § 30 (1985). Class actions permit litigants to pool claims which, like those in the instant case, if litigated individually, might prove uneconomical. *See, e.g., Phillips Petroleum v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 2973, 86 L.Ed.2d 628 (1985) (involving royalty owners of gas leases with claims averaging $100 per person). *See also* 1 Herbert B. Newberg, *Class Actions,* § 5.13 (2d ed. 1985) (an important objective of Rule 23 is to allow plaintiffs to vindicate small claims). Treating the plaintiffs collectively enhances the possibility of equal treatment. Distinctions among plaintiffs are more easily ascertained. Competence of court-supervised counsel may result in effective representation for all parties. Moreover, in a class action, the court can exercise greater control over the litigation, particularly attorneys' fees. For a comprehensive discussion of the advantages of class action treatment *see In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710, 802–811 (E. & S.D.N.Y.1991), *rev'd on other grounds,* 982 F.2d 721 (2d Cir.1993). *See generally* 1 Herbert B. Newberg, *Class Actions,* § 5 (2d ed. 1985) (discussing advantages and disadvantages of class actions).

A class action here might provide many advantages. By concentrating all litigation in a single forum, transaction costs would be reduced, duplicative litigation avoided and attorneys' fees substantially reduced. The total recovery among creditors might be enhanced and would be more equitably distributed.

### 1. Opt-out Class Action

A class action that permits a plaintiff to be excluded from the litigation is beneficial in that it gives that individual a sense that his individual rights are preserved because he can proceed in a separate lawsuit. *See, e.g., Phillips Petroleum v. Shutts,* 472 U.S. 797, 810–11, 105 S.Ct. 2965, 2973–74, 86 L.Ed.2d 628 (1985) (discussing due process requirement of opt out procedure). But where, as here, a limited fund is involved, "individual litigants face potential prejudice to their rights and ability to recover if the claims proceed separately." *Id.* 129 B.R. at 806. A litigant who proceeds individually also faces the possibility of diminished recovery because of higher transactional costs. *See generally* Linda S. Mullenix, *Class Resolution of the Mass–Tort Case: A Proposed Federal Procedure Act,* 64 Tex.L.Rev. 1039, 1075 (1986) (discussing advantages and disadvantages of opt-out device in mass tort context).

### 2. Mandatory Class Action

Given the limited nature of the assets available to satisfy the many outstanding claims against the Fund, a mandatory class action, where individuals are not permitted to pursue litigation independently of the class, has many benefits in a case such as this. *See* Fed.R.Civ.P. 23(b)(1)(B). *See generally* 1 Herbert B. Newberg, *Class Actions,* § 4.09 *et seq.* (2d ed. 1985). This procedure is particularly appropriate where class members have claims against a fund whose assets may prove insufficient to satisfy all of them. *See generally* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1774 (2d ed. 1986). *See, e.g., In re Joint E. and S. Dist. Asbestos Litig.,* 134 F.R.D. 32 (E.D.N.Y.1990) (asbestos manufacturer); *Zeffiro v. First Pennsylvania Banking & Trust Co.,* 96 F.R.D. 567, 573 (D.C.Pa.1983) (investors of bankrupt corporation); *Bradford Trust Co. v. Wright,* 70 F.R.D. 323 (E.D.N.Y.1976) (profit sharing and benefit employee trust). *See also,* discussing advantages of mandatory class actions in the mass tort context, *Comment, In re Joint Eastern and Southern Districts Asbestos Litigation: Bankrupt and Backlogged—A Proposal for the Use of Federal Common Law in Mass Tort Class Actions,* 58 Brooklyn L.Rev. 553, 596–601 (1992); Kevin H. Hudson, *Comment, Catch–23(b)(1)(B): The Dilemma of Using the*

*Mandatory Class Action to Resolve the Problem of the Mass Tort Case,* 40 Emory L.J. 665, 714–16 (1991).

In a mandatory class action settlement efforts may be enhanced because it allows the parties to achieve a comprehensive global settlement of the litigation. The relative disadvantages of the procedure, such as the suppression of litigant autonomy, and the fact that so-called "marginal" plaintiffs participate in the recovery, are not relevant to the instant case where there are no complex problems of proof, and recovery will be limited to monies owed to health care providers, participants and beneficiaries pursuant to the terms of the plan.

There are, however, compelling reasons for the court to avoid even this more desirable class action format. A mandatory national class action would trigger the expensive procedural safeguards that Rule 23 demands. *See generally* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 1785–1787 (2d ed. 1986). Class certification hearings and notice requirements are time-consuming and involve considerable expense. In the event a settlement is ultimately reached, fairness hearings would cause additional delay. Should the class action be appealed, further delays and additional transaction costs can be anticipated. Legal fees will mount. *See generally* 1 Herbert B. Newberg, *Class Actions,* § 5.05 *et seq.* (2d ed. 1985) (discussing delays).

### 3. Use of Subclasses

Even in the absence of a formal class action, the use of subclasses to classify claims or interests is desirable. *See* 11 U.S.C. § 1122. "If a ... settlement is to be permitted in the insolvency context, in which adjustment of creditors' rights would normally be accomplished pursuant to the Bankruptcy Code, there must be careful observance of subclass requirements." *In re Joint E. & S. Dists. Asbestos Litig.,* 982 F.2d 721, 744 (2d Cir.1992). Subclassing ensures that like claims will be treated similarly and that transactional costs will be minimized. It comports with the overall policy of the ERISA—to protect participants' expected payments. *See Outzen v. Fed. Deposit Ins.*

*Corp. ex rel. State Examiner of Banks of the State of Wyoming,* 948 F.2d 1184, 1188 (10th Cir.1991).

### E. Quasi Bankruptcy as a Federal Common Law Remedy

■ "[I]t is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries." *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied sub nom. Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). It follows logically that the court should be able to afford similar protection to those who are in danger of losing valuable health care protection.

ERISA has its roots in the common law of trusts. *See Mertens ét al. v. Hewitt Assoc.,* — U.S. —, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). The Supreme Court has authorized courts "to develop a federal law of rights and obligations under ERISA-obligated plans." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (citation omitted). In developing federal common law under ERISA, courts "are to be guided by the principles of traditional trust law." *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 16 (2d Cir.1991), *cert. denied sub nom. Fairway Spring Co. v. Sovran Bank/Maryland,* — U.S. —, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992). *See Specialty Cabinets & Fixtures, Inc. v. American Equitable Life Insur. Co.,* 140 F.R.D. 474, 478 (S.D.Ga.1991) (approving class certification in suit to recover benefits from insolvent ERISA welfare benefit plan).

Federal courts have historically asserted jurisdiction over trusts for the protection of the interests of their beneficiaries. *See generally* 3 Austin Wakeman Scott, *The Law of Trusts,* § 199.4 (3d ed. 1967). *See, e.g.,* involving employee benefit funds, *Brotherhood of Locomotive Firemen & Engineermen et al. v. Pinkston,* 293 U.S. 96, 99, 55 S.Ct. 1, 1, 79 L.Ed. 219 (1934) (suit in equity brought by beneficiaries for an accounting, determination of priorities and proper liquidation of the funds); *Hood v. Journeymen Barbers, et*

*al.,* 454 F.2d 1347, 1349 (7th Cir.1972) (assets of "functionally insolvent" pension fund properly frozen pending hearing as to whether receiver should be appointed); *Specialty Cabinets & Fixtures v. American Equitable Life Insur. Co.,* 140 F.R.D. 474, 475 (S.D.Ga. 1991) (noting that insurance company covering ERISA employee benefit plan had been placed in receivership).

█ Federal courts have the power to develop federal common law-equity remedies where "the particular facts of a case ... fall outside the literal coverage of a federal statute, but the use of common law will fill gaps in the congressional statutory patterns or otherwise make that pattern effective." *Quasar Co. v. Atchison, Topeka & Santa Fe Ry. Co.,* 632 F.Supp. 1106, 1112 (N.D.Ill. 1986). In fashioning a federal common law remedy, the court may look to a wide variety of sources. *See, e.g., Chuidian v. Philippine Nat'l. Bank,* 976 F.2d 561, 564 (9th Cir.1992) (federal common law rules for choice of law follow the approach of the Restatement of Conflicts of Laws); *First Amer. Title Ins. Co. v. United States,* 848 F.2d 969, 971 (9th Cir.1988) (adopting state law to create uniform federal common law for determining effect of federal tax lien on property interest). *See generally* Martha A. Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv.L.Rev. 883, 893 ("Either constitutional or statutory sources can provide the basis for the power for the federal court to make common law.").

█ Federal statutes themselves are often a source for federal common law. *Quasar Co. v. Atchison, Topeka & Santa Fe Ry. Co.,* 632 F.Supp. 1106, 1112 (1986). It is appropriate for a court to look to the legislative policy underlying the statute and fashion a remedy to effectuate that policy. *Id. See, e.g., Society of Professional Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1979) (federal courts may develop a common law of antitrust "giving shape" to the "broad mandate" of the Sherman Act); *Textile Workers Union of Amer. v. Lincoln Mills of Alabama,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957) ((Taft–Hartley Act is source of federal common law governing validity of labor arbitra-

tion awards); *Gaff v. Federal Deposit Insur. Corp.,* 919 F.2d 384, 395 (6th Cir.1990) (looking to FIRREA and the Bankruptcy Code to formulate federal common law principle governing priority of stockholders' claims against insolvent bank after FDIC takeover); *United States of America v. Burnette–Carter Co.,* 575 F.2d 587, 590 (6th Cir.), *cert. denied,* 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978) (Uniform Commercial Code and state law precedents are source for federal common law governing FHA secured transactions).

Even if the trust is not eligible for bankruptcy protection, "the [Bankruptcy] Code is instructive here." *In re Consolidated Welfare Fund "ERISA" Litig.,* 798 F.Supp. 125, 128 n. 4 (S.D.N.Y.1992) (ordering stay, analogous to automatic stay pursuant to 11 U.S.C. § 362, of all suits against insolvent welfare fund). *See also,* utilizing "quasi bankruptcy" approach when case does not fall neatly within federal bankruptcy law, *Lee v. Koppel Indust. Car & Equip. Co.,* 295 F. 23, 25 (1st Cir.), *cert. denied,* 265 U.S. 584, 44 S.Ct. 459, 68 L.Ed. 1191 (1924).

A "quasi bankruptcy" approach may be desirable for several reasons. A race for the debtors' assets, where some creditors are fully satisfied and others receive nothing can be avoided. Rather than acting on their own, creditors' actions can be stayed so they will receive their *pro rata* share. Like a bankruptcy proceeding, quasi bankruptcy will enable the court to maximize the assets available for the satisfaction of creditor claims and distribute those assets equitably among those creditors. *See* Barry L. Zaretsky, *Insurance Proceeds in Bankruptcy,* 55 Brooklyn L.Rev. 373, 377–78 (1989). Since the court has the power to appoint a receiver, it appears to have the power, *a fortiori,* to utilize a less stringent method to allow the parties to resolve the matter themselves.

In adopting an equitable bankruptcy remedy a court is "not creating a right from whole cloth. [It is] simply following the legislative directive to fashion, where congress has not spoken, a federal common law for ERISA by incorporating what has long been embedded in traditional trust law and equity jurisprudence." *Chemung Canal Trust Co. v. Sov-*

*ran Bank/Maryland,* 939 F.2d 12, 16 (2d Cir.1991), *cert. denied sub nom. Fairway Spring Co. v. Sovran Bank/Maryland,* —— U.S. ——, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992). The large number of people involved and the public interest at stake would support such action.

### F. *Negotiated Settlement*

The court can also encourage the parties to achieve a negotiated settlement. Negotiated settlements may be accomplished through the efforts of a court appointed mediator, a settlement judge or a Special Master. *See generally Manual for Complex Litigation* § 23 (2d ed. 1985). The benefits of this procedure are obvious. Delays and costs are minimized, direct and early communication among the parties is facilitated and litigant satisfaction is enhanced. *See Dispute Resolution Procedures in the Eastern District of New York* (E.D.N.Y.1992).

### III. APPLICATION OF LAW TO FACTS

■ A stay of all federal and state pending cases against the Fund is necessary in aid of the court's jurisdiction. The court's authority to stay all cases is enhanced by the involvement of the Department of Labor in the case. Only by staying all other proceedings can the court achieve the federal policy of maximizing the assets of the Fund for the benefit of all creditors and preventing recovery from its assets in an inequitable manner. A "race to the courthouse" would result in attorneys' fees and transaction costs depleting the Fund's remaining assets. *See In re Consolidated Welfare Fund "ERISA" Litig.,* 798 F.Supp. 125, 128 (S.D.N.Y.1992).

■ Even if in the absence of a stay, there is some question as to whether the assets of this trust would be reachable by judgment creditors. Under New York law, unless specifically designated otherwise, all trusts are afforded spendthrift protection. N.Y.EPTL 7–1.5. Creditors are prevented from reaching the interest of a trust, unless the trust is created by the judgment debtor for his own use. N.Y.EPTL 7–3.1. This rule is most commonly applied to *inter vivos* and testamentary trusts. Certain funds deposited in ERISA trusts may be reached by creditors, absent application of the exception to the spendthrift rule. *See Planned Consumer Marketing, Inc. v. Coats & Clark, Inc.,* 71 N.Y.2d 442, 527 N.Y.S.2d 185, 191–92, 522 N.E.2d 30, 36–37 (Ct.App.1988) (ERISA trust created to defraud creditors subject to exception to spendthrift protection but ERISA trust exempt from attachment by creditors where employer attempts to reach assets of employee in satisfaction of a judgment); *National Bank of North Amer. v. Intern'l. Brotherhood of Elect. Workers Local # 3, Pension and Vacation Funds,* 69 A.D.2d 679, 419 N.Y.S.2d 127, 130 (2d Dep't), *appeal dismissed,* 48 N.Y.2d 752, 422 N.Y.S.2d 666, 397 N.E.2d 1333 (Ct.App.1979) (ERISA plans not exempt from state statute governing enforcement of money judgments). Liquidating trusts, such as the Manville Personal Injury Settlement Trust, and business trusts evidenced by certificates of beneficial interest, are not "trusts" for the purposes of the Fiduciary Powers Act as used in the New York Estates, Powers and Trusts Laws. N.Y. ETPL 11–1.1(a).

It is unclear whether the Fund would be eligible for bankruptcy protection as a business trust under a federal common law analysis. The trust in issue has many similarities to the benefit plan approved as a business trust in *In re Affiliated Food Stores, Inc., Group Benefit Trust,* 134 B.R. 215 (Bankr. N.D.Tex.1991). Like the trust in *Affiliated,* under the terms of the Amended Declaration of Trust, the Fund's stated purpose is "to pay or provide for the payment of welfare benefits specified in the Plan to employees . . . to establish and accumulate such reserve funds [as deemed necessary] . . . to pay the reasonable and necessary expenses of administering the Plan and the Trust Fund." (Art. II, § 2.1(b)). Its business activity, too, involves collecting and receiving employer contributions and paying claims of beneficiaries. Although the Fund does not currently utilize the services of a third party administrator to secure a financial discount for its beneficiaries, it did take advantage of such reduced rate medical care in the recent past. It is unclear whether, in fact, the Fund's approach to health care benefits resulted in the kind of tangible financial benefit and control of costs

that qualified the *Affiliated* plan as a business trust, but arguably many of those who agreed to setting up the trust hoped that this would be the result. Given the uncertainty of the Fund's eligibility for bankruptcy relief and the expense and delay associated with a formal bankruptcy proceeding, the parties should probably look to other options available to meet their needs.

■ In deciding upon a procedure to resolve the Fund's problems, the court's chief concern must be which procedure will best serve the interests of debtors and creditors and will afford the protections of bankruptcy, receivership and the class action. One practical solution for the reasonable people involved here is a quasi bankruptcy.

The speed and flexibility of a quasi bankruptcy, with some of the attributes of statutory bankruptcy, receivership and class action, may be preferable in the instant case where all parties appear to be cooperating to obtain a quick and inexpensive resolution of the case.

By staying all federal and state actions and concentrating the resolution of the matter in the hands of the Special Master together with attorneys representing the various subclasses, the parties may achieve many of the benefits of a mandatory class action. Costs can be greatly reduced. Legal fees can be held to a minimum. All creditors can be treated equitably. Settlement can ·be achieved quickly.

By appointing a Special Master to work with the various groups of creditors to enhance the Fund's assets and to arrange for their equitable dissolution, the beneficiaries will have a voice in the process, ensuring that the Fund is properly handled. Much like the trustee in bankruptcy, the Special Master can help serve as the representative of all creditors. Much like the independent receiver, the Special Master can ensure that the current management team continues to protect and preserve the Fund's assets for the benefit of creditors. Unlike receivership, however, the Fund will not lose control of its assets.

Given the vast experience and the extraordinary talents of Special Master Mollen, the court has confidence that he will be able to negotiate a settlement among all the parties. This is clearly the most desirable option for all concerned.

## IV. CONCLUSION

All action against the Fund or its participants or beneficiaries is stayed. Special Master Milton Mollen will assist the classes of creditors in enhancing the Fund's assets and providing for their equitable distribution. As needed, the court, on application, will take appropriate action to assist the parties in the prompt resolution of the matter.

SO ORDERED.